IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 11-2460  EMSL

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

LELAND BEASLEY

        Defendant-Appellant.

---

Appeal from the United States District Court
for the Eastern District of Missouri
District Court No. 4:10 CR 119


The Honorable Carol E. Jackson
United States District Judge Presiding

---

## ADDENDUM TO BRIEF OF APPELLANT-DEFENDANT

---

        Nanci H. McCarthy
        Assistant Federal Public Defender
        1010 Market Street, Suite 200
        St. Louis, Missouri 63101
        (314) 241-1255
        ATTORNEY FOR DEFENDANT-APPELLANT

Nina B. Chasnoff, a third year law student at Saint Louis University, substantially
assisted in the preparation of this brief.

ADDENDUM CONTENTS

Memorandum and Recommendation of United States Magistrate Judge ....... 1

Order of Magistrate Judge Adelman dated March 11, 2011 ................ 27

Judgment ...................................................... 29

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S3-4:10CR119 CEJ |
| | ) | |
| LELAND BEASLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant

to 28 U.S.C. §636(b).   Presently pending in this matter are Defendant Leland Beasley's motions to

suppress evidence and statements.   The undersigned held hearings on the motions to suppress on

August 30, 2010 and on December 9, 2010.   Based upon the evidence adduced at the hearings, as

well a review of the transcripts and briefs of the parties, the undersigned makes the following findings

of fact and conclusions of law:

**Findings of Fact**

Anthony Cavaletti is a detective in the child abuse unit of the Crimes Against Persons section

of the St. Louis County Police Department.   This unit investigates allegations of child sexual abuse.

On January 5, 2009, Cavaletti received information from the Missouri Division of Children's

Services that a minor with the initials K.N. had been the victim of sexual abuse.   Det. Cavaletti and

an individual from the children's services department went to a grade school in St. Louis County.

At the grade school, they interviewed K.N. who told them that the Defendant Leland Beasley had

touched his penis through his clothing while K.N. was at the Defendant's Gamestation Sector 19

store in South St. Louis County.   K.N. was nine years old at the time of the alleged sexual assault. Another minor, whose initials are C.D., was also interviewed at the grade school.  C.D. told Cavaletti that he observed pictures of naked children on a computer at the Defendant's Gamestation Sector 19 store.  A boy whose initials were B.N., who was a minor, was also interviewed by Cavaletti.  B.N. also told Cavaletti that he observed child pornography on a computer at the Defendant's Gamestation Sector 19 store.  Cavaletti also interviewed a second boy with the initials B.N.  This B.N. told Cavaletti that the Defendant had performed an act of oral sex on him at the Gamestation store.  He also told Cavaletti that he observed the Defendant perform oral sex on two other boys.  He told Cavaletti the names of these boys.  All of this took place at the Gamestation store.  He also told Cavaletti that he observed the Defendant perform oral sex on a boy named R.I. during a trip to Wisconsin.

At this point, Cavaletti terminated the interview with B.N. so B.N. could be further interviewed at the child advocacy center by individuals who were specially trained to talk to a person with B.N.'s characteristics.

After completing the interview with B.N., Det. Cavaletti decided to interview the Defendant. To this end, on the afternoon of January 5, 2009, he and Sgt. Guinn of his unit went to the Defendant's Gamestation Sector 19 store on Lemay Ferry Road in St. Louis County. The Sector 19 store was a store where individuals could buy computer video games or play the computer games while at the store.  When the detectives arrived at the store, there were children on the premises. They contacted an employee of the store, and asked to speak to Beasley.  The employee left the area and returned with Beasley.  At this point, Cavaletti asked Beasley if he could talk to him, and further said it would be better if the children left the store.  Either Sgt. Guinn or Beasley asked the children

Appellate Case: 11-2460   Page: 4   Date Filed: 09/26/2011 Entry ID: 3832994

to leave the store. The Defendant agreed to talk to the detectives, and they informed Beasley of their investigation. They asked permission to examine the computers at the store, and provided the Defendant with a consent to search and seize the computers. They handed him the consent form which he appeared to read and sign. No threats or promises were made to him to obtain his consent. After about ten minutes, Cavaletti asked Beasley if he would go to the police station with them to continue the interview. Beasley agreed to do so, and, at that point, was cooperative. Cavaletti drove to the police station, and the Defendant sat in the front passenger seat of the vehicle. The Defendant was not handcuffed or restrained in any way, and no threats or promises were made to him to induce him to go to the police station.

When the Defendant arrived at the police station, he was given another consent form to allow a thorough examination of the computers seized at the Sector 19 store. He read and signed the consent form and a detective with the child pornography unit scanned the computer. No child pornography was discovered on the computer. Next, the Defendant was advised of his <u>Miranda</u> rights before being interviewed at the station. The officers provided the Defendant with a St. Louis County advice of rights form, and read each right to him from the form. After reading each right, they asked the Defendant if he understood the right, and he stated that he did understand. He also initialed each right indicating that he understood. The Defendant was also read the waiver portion of the advice of rights, agreed to talk to the officers, and signed the waiver of rights. He made a statement to the officers, telling them that he had accidentally touched K.N.'s penis through his clothing. The Defendant denied any illegal intent. At the end of the interview, the Defendant was arrested and charged with child molestation.

Appellate Case: 11-2460   Page: 5   Date Filed: 09/26/2011 Entry ID: 3832994

On January 6, 2009, Cavaletti continued his investigation by again going back to the school to interview more children. Cavaletti interviewed a boy whose initials are T.E., who told Cavaletti that the Defendant had rubbed his back, down to the crack of his buttocks. Cavaletti also interviewed an individual whose initials were R.I., who at first told Cavaletti that he had awakened in the middle of the night and thought something had happened to him, but that the Defendant told him to take a shower and forget it. Later, R.I. told the detective that what actually happened was that the Defendant performed oral sex on him. Cavaletti also interviewed a child whose initials were R.B., who said he woke up at the Gamestation and found his pants unzipped. Later, R.B. told his counselor that the Defendant had performed oral sex on him. Cavaletti also talked to several other boys at the school who told Cavaletti that the Defendant improperly touched them.

On January 6, 2009, Cavaletti also talked to the prosecuting attorney. The prosecuting attorney decided to file a complaint against the Defendant for child molestation first degree with K.N. as the sole victim of the child molestation. The prosecutor decided not to file other charges at that time because Cavaletti was still investigating the matter.

On January 13, 2009, the Defendant's ex-wife met with Cavaletti and other detectives. She told the detectives that she had recently been divorced from the Defendant, and as part of her divorce decree, she obtained an automobile from the Defendant. She picked up the automobile at the Defendant's Gamestation store, and while she was cleaning out the vehicle, she found eleven CDs that were marked "virus." She played the CDs and found that they contained images of naked children and of child pornography. She called the St. Clair County Sheriff's Office and turned the CDs over to them. On January 15, 2009, Cavaletti went to the St. Clair County Sheriff's Office, and viewed the CDs that they obtained from the Defendant's ex-wife. The CDs contained multiple

4

photographs of young boys in sexual positions with each other, and with adults. Also contained on one of the CDs was a photograph of R.B., who Cavaletti previously interviewed at the grade school. The photograph showed R.B. with his pants pulled down and his penis showing. He appeared to be asleep. The background in the photograph appeared very similar to the Defendant's Gamestation store.

Det. Cavaletti also talked to Tim Douglas, who was an employee of the Defendant and who worked at the Gamestation store with him. Douglas told detectives that the Defendant called him from jail on the night he was arrested. The Defendant told Douglas he wanted him to go to the Gamestation store on Lemay Ferry, gather some specific items, and take them to his mother's house. Among the items the Defendant told Douglas to gather were a digital camera, a camcorder, a black metal box, and other items. Apparently, Douglas told the detectives about seven specific items. Pursuant to this information, Sgt. Guinn went to Beasley's mother's house, whose name is Leslie Moss. Det. Guinn determined from Moss that Douglas brought the items to her at the house. Guinn asked Moss if he could view the items, and if he could take them from her. She led Guinn to a bedroom and showed him several items left by Douglas. These included a DVD player which was in a canvas bag, a Sony digital camera, a Sony camcorder, and a metal box with a combination lock, which evidently were not in the bag, but were just in the bedroom. He asked Moss if he had her permission to seize the cameras and the metal box and other items retrieved from the Gamestation store. Ms. Moss was cooperative with the officers and signed a consent form. Guinn determined from Moss that the Defendant did not live or stay at Moss's house, but sometimes used her address for legal purposes and for his driver's license. At this point, Guinn seized the items and took them to police headquarters, but did not search the digital cameras or the metal box.

After Cavaletti viewed the video tapes of the child pornography from Defendant's ex-wife, and received the digital camera and "strong box" from Guinn, he talked to the prosecuting attorney about how to proceed in further investigating the matter.  At this point, the Defendant was only charged with child molestation, and there were no charges against him related to either the production or possession of child pornography.  Cavaletti said he did not interview the Defendant on January 5, 2009 about child pornography charges because he had been unable to confirm that there was any child pornography until his ex-wife told him about the videos.  The prosecutor and Cavaletti decided they would first ask the Defendant for consent to the search of the metal box and the cameras, and then interview the Defendant about the separate charges of production and possession of child pornography.  The prosecutor and Cavaletti discussed obtaining a search warrant to search the box and cameras, and decided if the Defendant did not consent to the search, the prosecuting attorney and Cavaletti would seek a warrant to search those items.  This conversation about obtaining a search warrant if the Defendant refused to consent was discussed before Cavaletti ever approached the Defendant to seek his consent.

To this end, on January 19, 2009, Cavaletti and a second detective went to the St. Louis County Jail, picked up the Defendant, and conveyed him in custody to police headquarters.[1]  In an interview room, Det. Cavaletti laid out the two cameras and the lock box on a table.  He told the Defendant that he retrieved the items from his mother's house, and would like to have his permission to look into them.  The Defendant gave Cavaletti oral consent to search the items.  At this point, the

---

[1]    It should be noted that on January 7, 2009, the Defendant made an appearance in the Circuit Court of St. Louis County, Missouri.  At that time the Public Defender was appointed to represent the Defendant, an arraignment was conducted, and a preliminary hearing was scheduled on February 5, 2009.

detectives handed the Defendant a consent to search form for the two cameras, and Beasley appeared to read the form and signed it, acknowledging his consent to search the cameras.

Next, they presented a consent form to search the locked box. At about this time, they also asked the Defendant for the combination to the lock on the box so they would not have to break it open. The Defendant said he did not even know if it was his box. Cavaletti asked the Defendant if he owned a box like the one in front of him, and the Defendant replied that he did own a similar box. Cavaletti told him that he picked up the box from his mother's house, and knew it was the Defendant's. The Defendant said if it was his box, he forgot the combination. After hesitating a moment, the Defendant signed this consent form also. The Defendant never revoked his original oral consent to search the box, and did not refuse to sign the consent form, but only questioned if the box was his box. After the consent to search form was signed, Det. Cavaletti advised the Defendant of his complete <u>Miranda</u> rights prior to interviewing him about the child pornography case. At the end of the advice of rights, the Defendant told Cavaletti that he did not wish to talk to him, and wished to speak to his attorney.

### Conclusions of Law

#### A. Consent to Search Granted by Moss

Based on the above facts, the undersigned concludes that the Defendant's mother, Ms. Moss, had the authority to allow the officers to view the items brought to her house by Tim Douglas, even if she did not have the authority to allow the search of these items or even the seizure of the items. In <u>United States v. James</u>, 571 F.3d 707 (7th Cir. 2009), the defendant's mother retrieved a locked safe belonging to the defendant from the residence which the defendant had rented. Because the defendant was incarcerated and his lease was up on the rented apartment, he had asked his mother

to retrieve the safe from the apartment. She did so and stored the safe in her house. At some point during this time, the defendant told his mother there was a gun locked inside the safe. The defendant was being investigated on multiple bank robberies, and a few months after the bank robberies, a detective visited the defendant's mother. She informed him of the safe and the gun, and eventually gave the detective permission to seize the safe, so that he might obtain a warrant to search the safe. The question on appeal for the Seventh Circuit did not involve the search of the safe itself, the question was the mother's access to the safe itself and not its contents. In this regard, it is similar to the case now at bar. In upholding the officer's seizure of the safe, the Court stated as follows:

> James's privacy interest in the contents of the safe is not at issue in this case. After law enforcement officers removed the safe from James's mother's home, they obtained a search warrant before opening and searching the safe, and James does not challenge that search. . .

> . . .Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Based on the concept of assumption of risk, that exception to the warrant requirement extends to consent legitimately obtained from a third party. . .Thus, where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents. . .

571 F.3d 707, 713, 714.

In specifically holding that the defendant's mother had actual or apparent authority to allow viewing or seizure of the safe itself, the Court stated as follows:

> . . .Consent to a search or a seizure may be obtained from any person who has common authority over the property (actual authority). . . or who would appear to a reasonable person, given the information that law enforcement possessed to have common authority over the property. . (apparent authority). . .Adopting the Court's guidance to an initial seizure, as opposed to a subsequent search, we conclude that Martin had authority to consent if: (1) she had joint control of or access to the safe itself (regardless of whether she had access to the contents of the safe) (actual

authority); or (2) it was reasonable for police to believe that she had joint control of or access to the safe itself (apparent authority).

. . .Even though the safe contained only James's belongings, Martin exercised control over the safe itself. There is no evidence that James attempted to limit or restrict her control over the safe. On these facts, we can conclude that James assumed the risk that Martin would consent to the safe's seizure; Martin had actual authority to consent. Even if James had not granted actual authority to Martin, she had apparent authority because a reasonable person, given the information that Det. Zimmerman possessed, would believe that Martin had joint control of the safe.

571 F.3d 707, 714, 715.

Given the above, the undersigned concludes that the Defendant's mother had joint control of the items that Douglas brought to her home. The Defendant called Douglas and asked him to go to his store and obtain specific items, including two cameras, a lock box, and a bag of clothes, and take them to his mother's house. He did not give his mother or Douglas any further instructions. He did not say to not call the police or not tell third persons he was doing this. The Defendant, in asking Douglas to go retrieve specific items including cameras from his store, certainly gave Douglas physical control over the cameras and the lock box themselves, and assumed the risk that Douglas would tell others about the existence of these items and show them to others. This is exactly what happened in the case now at bar. Douglas called the police and told them that the Defendant had requested that he remove the items from his store and take them to his mother's house. He told them the specific items that were taken to the mother's house, and when the police went to the mother's house and asked to see them, it was apparent that she knew exactly what they were asking for, and that the items were in her house. She had adequate control over the items to show the officers at least the outside of the cameras and lock box, and because no limitations were placed on her access to the cameras and lock box (whether or not she had access to the contents), the undersigned concludes that she also had apparent authority to allow the police officers to seize the items.

9

Even if Moss did not have the authority to allow seizure, she, along with Douglas, were given the apparent authority to allow the officers to look at the items brought to her house. In telling Douglas to go to his premises and obtain certain items and take them to his mother's house, the Defendant assumed the risk that Douglas, having control over these items and knowledge of them, would tell others about them, and that either Douglas or his mother would show the items to other persons including authorities.

As soon as the police observed the two cameras and the lock box, they could seize the items because they were lawfully in their plain view, and it was readily apparent that they were evidence or might contain evidence of criminal activity. At the time the two digital cameras and the lock box were displayed to the police officers, they were aware that several minor children had been sodomized or otherwise molested by the Defendant. They were also aware that the Defendant had a large collection of child pornography, and the Defendant had filmed or taken a picture of at least one of their victims, and that a video tape or picture existed showing the genital area of this victim. They were aware that the background in the picture of the victim in an unclothed state appeared to be at the Gamestation store. They were aware that Hudson had been told to go to the store, and were aware that Hudson had retrieved the lock box and the cameras from the game store. This being the case, the undersigned concludes that at the time they viewed the two cameras and the lock box, they had reason to believe that the two cameras might be evidence of crime, since they were originally at the Gamestation store, and since they had evidence that the Defendant was filming or producing child pornography on those premises. In addition, it was readily apparent to them that the lock box might contain evidence of criminal activity. In this regard, they had been given video tapes of child pornography which the Defendant secreted in his vehicle, and it was likely, given the fact that the lock

10

box was stored at the premises with the cameras, that the lock box also contained evidence of the criminal activity.

The plain view doctrine allows law enforcement officers to seize evidence when: 1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence can be plainly viewed; 2) the objects incriminating character is immediately apparent, and 3) the officer had a lawful right of access to the object. See United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997). The first and third elements of the plain view doctrine are really corollaries of each other and are related and are similar. The "lawful right of access" stems from the proposition that an officer must have access to the object by way of a search warrant or other exigent circumstances such as consent in a manner that he is able to lawfully view the object and seize the object. As to the second element, the seminal case involving the meaning of "immediately apparent," is Texas v. Brown, 460 U.S. 730 (1983). In defining "immediately apparent," the Court stated as follows:

> . . .But the Court of Criminal Appeals, as we have noted, felt that the state's case ran aground on the requirement that the incriminating nature of the items be "immediately apparent" to the police officer. To the Court of Appeals, this apparently meant that the officer must be possessed of near certainty as to the seizable nature of the items. Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine. . .

> . . .Plainly, the Court did not view the "immediately apparent" language of *Coolidge* as establishing any requirement that a police officer "know" that certain items are contraband or evidence of a crime. Indeed, *Colorado v. Banister*, *supra*, was merely an application of the rule, set forth in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that "[t]he seizure of property in plain view involves no invasion of privacy and is **presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity**. *Id.* at 587, 100 S.Ct. at 1380 (emphasis added). We think this statement of the rule from *Payton*, *supra*, requiring probable cause for seizure in the ordinary case is consistent with the Fourth Amendment, and we reaffirm it here.

<u>Texas v. Brown</u>, 460 U.S. 730, 741, 742.

In upholding the seizure of a silencer, the Court stated as follows as to items seen in plain view:

> "Probable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.' "

<u>United States v. Weinbender</u>, 109 F.3d 1327, 1330, 1331.

Further, in <u>United States v. Albers</u>, 136 F.3d 670 (9th Cir. 1997), the Court upheld the seizure of video tapes even though the video tapes could not be viewed until later, and therefore it could not be absolutely confirmed that the video tapes contained evidence of a crime.

The Defendant cites <u>United States v. Mar James</u>, 353 F.3d 606 (8th Cir. 2003) as dispositive to this matter. Because <u>Mar James</u>, <u>supra</u>, differs in several significant respects from the case now at bar, the Defendant's argument must fail. In <u>Mar James</u>, <u>supra</u>, the defendant gave computer discs to a third party with directions to hold the discs for him. He marked the discs "confidential" and "private," and placed them in a sealed envelope with his name on the envelope. Significantly, his intention was to have the custodian destroy the discs, and not give them to authorities. The police were aware of this at the time they requested consent of the third party to seize and search the discs. The issue presented before the Court was whether or not, given the above facts, the defendant had manifested apparent authority or actual authority to a third party custodian to view the discs himself or to allow third parties to view the contents of the discs. The significant question involved viewing the contents of the discs and not access to the discs themselves. In holding, that the third party did not have authorization to allow police officers to view the contents of the discs, the Court stated as follows:

. . .Taken as a whole, such demonstrations of intended privacy evidence Mr. James's expectation that Mr. Laschober [third party] not view the discs contents.

. . .If Mr. James had intended to allow Mr. Laschober to look at the discs, why would he have delivered them sealed in tape, sealed in an envelope, with "confidential" written across the top of the pertinent disc?  We have a definite and firm conviction Mr. Laschober had no common authority either to look at the contents of the discs, or to allow anyone else to do so, and that the absence of evidence to this effect is plain.

353 F.3d 606, 614, 615.

In contrast, in the case now at bar as in United States v. James, 571 F.3d 707 (7th Cir. 2009), the Government does not claim that Moss or Hart had authority to grant consent to look at the contents of the box or the cameras.  The officers never envisioned searching the cameras or the box without first obtaining the Defendant's consent or a search warrant.  In Mar James, 353 F.3d 606, the key factor in suppressing the search of the disc was that no warrant or proper consent was obtained before a sophisticated search of the discs was conducted by the police.  In the case now at bar, a consent to search was obtained directly from the Defendant before any search occurred.  Further, the present case also differs from Mar James, supra, in that the detectives in the case now at bar already were started on a path to obtain a search warrant if the Defendant did not readily consent to the search of the items.  The possibility of obtaining a search warrant was not mere conjecture, but an investigative strategy worked out between the prosecutor and the detectives before even asking the Defendant for his consent.  Therefore, for the reasons stated above, United States v. Mar James, supra, is not dispositive to the case now at bar.

Based on the above, the undersigned concludes that it was "readily apparent" or "immediately apparent" that the two digital cameras, and the lock box likely contained evidence of criminal activity,

13

that being child molestation and the production of child pornography. Therefore, the seizure of the cameras and the lock box themselves was lawful.

### B. Consent to Search at the St. Louis County Police Headquarters, January 19, 2009

Based on the above facts, the undersigned concludes the consent to search the cameras and the lock box was voluntary and did not violate the Defendant's Fifth or Sixth Amendment rights.

As to the Fifth Amendment, courts have uniformly held that even if a defendant is advised of his rights after arrest on an indictment, and claims his right to an attorney, the Fifth Amendment does not preclude an agent obtaining a voluntary consent to search from that same defendant. In United States v. Cooney, 26 Fed.Appx. 513 (6th Cir. 2002), the defendant claimed that the district court erred because the defendant signed a consent to search her house after she invoked her right to counsel and to remain silent, after having been advised of her Miranda rights. In rejecting this challenge based on Fifth Amendment grounds, the Court stated as follows:

> The protections of the Fifth Amendment only apply to incriminating evidence of a testimonial or communicative nature. *See Schmerber v. California*, 384 U.S. 757, 760-61, 86 S.Ct. 1826, 16 L.Ed.2d 909 (1966). The courts that have considered this issue unanimously agree that consenting to a search is not an incriminating statement under the Fifth Amendment because the consent is not evidence with testimonial or communicative nature. . .

26 Fed.Appx. 513, 523.

The following courts also follow this principle in stating that requesting consent to search is not interrogation, and the response granting consent is not testimonial in nature. See Cody v. Solem, 755 F.2d 1323 (8th Cir. 1985); Smith v. Wainwright, 581 F.2d 1149 (5th Cir. 1978); United States v. Glenna, 878 F.2d 967 (7th Cir. 1989); United States v. Lemon, 550 F.2d 467 (9th Cir. 1977); United States v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993).

14

Based on the above, the undersigned concludes that the Defendant's Fifth Amendment rights were not violated by asking for consent to search the camera and the lock box after a lawyer had been appointed in this case. The mere asking for consent is not interrogation, and the Defendant's Fifth Amendment rights were not violated by the mere asking for this consent. Whether or not any questions in addition to asking for consent which called for the Defendant to admit ownership of the lock box by asking for its combination will be dealt with later in this memorandum.[2]

As to the Defendant's Sixth Amendment right to counsel, his right to counsel attaches once an adversary proceeding has been initiated against the Defendant. An adversary judicial proceeding can be initiated "by way of formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 689 (1972). After a defendant's Sixth Amendment right to counsel attaches, he has a right to advice of counsel at any stage of the prosecution, formal or informal, in court or out, where the absence of an attorney might take away from the defendant's right to a fair trial. The Supreme Court has referred to this stage as a "critical stage" of a criminal proceeding. See United States v. Wade, 388 U.S. 218, 226 (1967). Based on the above, the undersigned concludes that the Defendant's right to counsel had already attached at the time of the request for consent to search on January 19, 2009. He was arrested on the 6th of January, and a complaint charging him with child molestation was filed in the Circuit Court in St. Louis County on January 7, 2009. He was held in custody, and was afforded his initial appearance, and bond was set for him. On January 7, 2009, a lawyer was appointed to represent him in this matter, and the lawyer entered her appearance on the Defendant's behalf on that date. Further, the Defendant waived

---

[2] The undersigned has carefully reviewed the consent forms signed by the Defendant relating to the cameras and lock box, and concludes that the forms do not require the Defendant to admit ownership of items to be searched.

Appellate Case: 11-2460   Page: 17   Date Filed: 09/26/2011 Entry ID: 3832994

arraignment and the matter was set for preliminary hearing at a later time.  On January 19, 2009, the

Defendant had been in custody for at least 13 days, and had a lawyer representing him on charges of

molestation.  This was a matter of public record.  Therefore, the undersigned concludes that the

Defendant's Sixth Amendment right to counsel had attached on January 19, 2009.

The important question in the case now at bar then becomes whether or not requesting

consent to search is a "critical stage" of the proceedings.  In United States v. Cooney, supra, the

Court held that a consent to search is not a critical stage of the judicial proceeding.  In so holding,

the Court stated as follows in Cooney:

> A defendant's consent to search is not a critical stage of the proceedings.  *See Hidalgo,* 7 F.3d at 1569, 1570. . . In *Kon Yu- Leung,* the Second Circuit reasoned the Sixth Amendment right to counsel does not apply to a consent to search because a search does not generate evidence, but merely reveals evidence "already in existence and virtually certain to be available to the government in due course." *Kon Yu Leung,* 910 F.2d at 40.  In *Hidalgo,* the Eleventh Circuit used the same reasoning to hold that the defendant's lack of counsel did not violate his Sixth Amendment rights when he consented to a search of his residence after he had been indicted. . .

> The current facts are similar to those in *Hidalgo*.  Cooney was under indictment when the police went to her house.  They read Cooney her rights and she requested counsel.  Her voluntary consent to search the house does not implicate her Sixth Amendment rights because the search was not part of the adversary process.   If Cooney had not consented to the search, police could have quickly returned with a search warrant.

26 Fed.Appx. 513 at 524.

Given the above, the undersigned concludes that the request for the consent to search the

cameras and the lock box did not violate the Defendant's Sixth Amendment rights.  As in Cooney

supra, and United States v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993), the detectives were already aware

that the cameras were likely evidence of a crime and that an inspection of their technical capabilities

may well yield evidence of the production of child pornography.  They were also aware that the lock

16

Appellate Case: 11-2460    Page: 18    Date Filed: 09/26/2011 Entry ID: 3832994

box which was taken from the business premises and conveyed to Defendant's mother's house may also contain evidence of child pornography or child molestation. The lock box was a size which could conceal CDs, photographs or other evidence, it was taken from the shop at the request of the Defendant after the police had arrested the Defendant, and the shop or the store was the site of many acts of child molestation. The Defendant's ex-wife had turned over CDs of child pornography which were concealed in the Defendant's vehicle, and these CDs showed that some of the child pornography was likely produced at the Defendant's store. Further, prior to even approaching the Defendant and asking him for consent to search, the prosecutor and the detectives discussed this matter and decided if the Defendant balked at granting consent to search the cameras or the lock box, the prosecutor and the detectives would obtain a warrant to search the cameras and the lock box. The undersigned concludes that probable cause existed for the issuance of a warrant to search the cameras and the lock box, thus, as in United States v. Kon Yu Leung,910 F.2d 33 (2nd Cir. 1990); United States v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993) and United States v. Cooney, supra, the detectives were well aware of the existence evidence before requesting consent, and there is little doubt that the evidence would have been lawfully revealed even in the absence of that consent. Therefore, there was no Sixth Amendment violation.

The undersigned also concludes that the consent was voluntarily obtained. The evidence reveals that as soon as the Defendant was shown the camera and the lock box by the detectives, he was orally asked if he would allow the officers to look in the lock box, and to examine the cameras. He immediately and without hesitation granted permission to search all three items. The Defendant was not threatened in any way, nor was he promised anything in order to obtain his consent. There is no evidence that deception was used to obtain Defendant's consent. He never revoked his oral

17

consent and never gave any indication that he wished to withdraw the consent. The only conversation between the Defendant and the detectives came just prior to signing the written consent as to the lock box.

This came when detectives asked the Defendant for the combination to the lock box so that they would not have to break it open, and ended when the Defendant said if it was his lock box then he forgot the combination. This conversation had nothing to do with the voluntariness of the consent. It came after the Defendant unequivocally granted oral consent, and after the detectives asked the Defendant for the combination to the box.

The Defendant signed the written consent form after only a short hesitation. Further, no threats or promises of any type were made to induce him to sign the written consent. The detectives did not raise their voices and did not attempt to intimidate or coerce the Defendant in any way. The Defendant was coherent and knew exactly what he was doing because he had signed a form allowing detectives to search his computer on January 6, 2009, only 13 days before this consent was signed.

C.  Statements Made by the Defendant Relating to the Combination to the Lock Box, and Ownership of the Box and Cameras

Based on the analysis in Section "B" above, the undersigned concludes that the Defendant was in custody for purposes of being given his Miranda warnings on January 19, 2009. On that date, the Defendant had been arrested and held in the St. Louis County Jail for more than 13 days. He had been appointed an attorney; an attorney had entered her appearance on his behalf, and he had appeared in court and waived arraignment. The undersigned concludes that he should have been advised of his rights before any questions would be asked of him beyond asking him for his consent to search the box and the cameras. In addition, the undersigned concludes that the investigation of child pornography being conducted by the detectives, and their investigation of child molestation and

18

statutory rape, were close enough given the facts of this case to raise the possibility that the Defendant's Sixth Amendment right to counsel had attached.  Therefore, for both of the above reasons, the undersigned concludes that the colloquy between the Defendant and the detectives about his knowledge of the combination to the lock box, and whether or not he owned a similar lock box should be suppressed.  The undersigned further concludes that although the statements as to ownership of the box and cameras should be suppressed, the contents of both the box and the cameras should not be suppressed.

As stated above, even before any conversation about ownership of the box occurred, the Defendant had immediately and without equivocation granted oral consent to search the box and the cameras.  The Defendant never revoked this consent, even after the conversation about ownership. In addition, the undersigned concludes that the conversations about ownership neither added to nor detracted from the oral or written consent.  Additionally, the undersigned notes that the Supreme Court has refused to extend the exclusionary rule to items of physical evidence discovered by statements made by a defendant in violation of the defendant's Miranda rights as long as the statement is voluntary.  See United States v. Patane, 542 U.S. 630 (2004).  Because there is no indication that the statement is in any way not voluntary, the evidence of the cameras and the box may be admitted, as long as the statement itself is not admitted.

In addition, as stated thoroughly in "B" above, discovery of the evidence was inevitable.  In the case now at bar, unlike in Mar James, supra, the investigation did not "appear to be over" and there was evidence that the detectives were actively pursuing a "then existing alternative investigation."  United States v. Mar James, 353 F.3d 606, 617.  The prosecutor and detective had, prior to even approaching the Defendant and asking for consent, determined that if the Defendant

19

balked at all in giving consent, they would obtain a warrant to search the cameras and lock box.  As

outlined in Section "B" above, the undersigned concludes there was probable cause for the issuance

of a warrant to search these items.

### D.  Interviews Conducted on January 5, 2009

The Defendant states that Beasley should have been Mirandized immediately after being

approached at his place of business.  The Defendant states this because he alleges that the interview

was coercive, police dominated, the Defendant was arrested after agreeing to go to the police station

and was not told he was free to leave.  Based on the totality of the circumstances in this case, the

undersigned concludes that the Defendant's argument must fail.

In United States v. Rorex, 737 F.2d 753 (8th Cir. 1984), the Defendant was interviewed by

FBI agents at his place of business while a search warrant was being executed at that business.

Approximately three agents were involved in conducting the interview, while others were seizing

alleged stolen property from the defendant's business premises pursuant to the search warrant.  The

defendant was not advised of his rights, however, he was not taken into custody at the end of the

interview.  In delineating the standard to be followed as to whether or not a defendant is in custody

for purposes of Miranda, the Court stated as follows:

> The warnings required by *Miranda* are required only in situations involving custodial
> interrogations. . . The fact that an investigation may be said to have focused on a
> particular person does not necessarily make questioning custodial. . .Thus, in order
> to determine what constitutes custody for purposes of requiring *Miranda* warnings
> prior to the questioning of an individual, one must look at the totality of the
> circumstances involved.  Relevant factors include, but are not limited to:  (1) the
> scene of the interview, (2) the subjective intent of the officer in question, *i.e.*, did the
> officer intend to hold the individual in custody or to arrest him at the conclusion of
> the interview, (3) the age and experience of the person interviewed, and (4) the mode
> and manner of questioning, *i.e.*, was the design and tone of the questioning "such as
> to overbear the free will of the defendant.". . .

Appellate Case: 11-2460   Page: 22   Date Filed: 09/26/2011 Entry ID: 3832994

737 F.2d 753, 755, 756.

Further, the Court took into consideration, not just the agent's subjective intent, that is that the defendant was not arrested at the end of the interview, but over and above that, the Court determined as follows:

> Apart from Agent Downing's subjective intent, moreover Rorex was "on his own turf." This interview did not occur in a station house of *Miranda* or even the vacant office in the back of bank building that was the scene of the interview in our recent decision in *United States v. Dockery*, 736 F.2d 1232 at 1233 (8th Cir. 1984) (en banc) (held not custodial interrogation), but rather in Rorex's office at his place of business. While it may be said that the search of Rorex's store added some coercive aspects, all official questioning, as the Supreme Court has noted, has some coercive aspects.

737 F.2d 753, 756, 757.

Further, in <u>United States v. Czichray</u>, 378 F.3d 822 (8th Cir. 2004), the FBI arrived at the defendant's premises at 6:30 in the morning.  They knocked on the defendant's door, apparently awakening him from sleep, and told the defendant that they needed to talk to him.  Although during the course of the interview of the defendant (which lasted for seven hours), the officers told the defendant he was not in custody, they nevertheless told the defendant he should not go to work when he said he was late for work, told him not to answer the telephone when it rang several times, accompanied him to the bathroom or anywhere else in the house which he needed to go during the seven-hour interview, and told him that if he did not cooperate they would have to interview his 75 year-old father as well as several other people.  In stating the bottom line standard for whether a person is in custody, the Court stated as follows:

> The ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).The "only relevant inquiry" in considering that question is how a reasonable person in Czichray's position would have understood his situation.

21

378 F.3d 822, 826.

The Court also held that the fact that the interview took place at the defendant's home was a factor in determining that the defendant was not under any formal arrest. Further, in discussing the Lebrun standards, 363 F.3d 715 (8th Cir. 2004) en banc, the Court stated as follows:

> Although the "non-exhaustive" *Griffin* factors and their intended balancing test are often cited in our decisions concerning *Miranda*, we recently resolved the question of "custody" as an *en banc* court with nary a mention of *Griffin*. *See United States v. Lebrun*, 363 F.3d 715, 719-24 (8th Cir. 2004) (en banc). There is no requirement, therefore, that the *Griffin* analysis be followed ritualistically in every *Miranda* case. When the factors are invoked, it is important to recall that they are not by any means exclusive, and that "custody" cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly. Exploring the nuances of such vague factors as "voluntary acquiescence," "strong arm tactics," and "police dominated atmosphere" in order to place them on one side or the other of the balancing scale may tend to lose sight of the forest for the trees. The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the *historical facts*, as opposed to the one-step-removed *Griffin* factors, establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to "aggravate the existence of custody" cannot create the functional equivalent of formal arrest where the most important circumstances show its absence.

378 F.3d 822, 827, 828.

Given the above law, and especially, Czichray, supra, the undersigned concludes that the Defendant did not need to be given his Miranda warnings when approached at his place of business or during the time of interview at his place of business. The Defendant was not handcuffed or otherwise restrained in any significant way, no guns were drawn by the police officers, the police officers were in plain clothes and their guns were concealed, no threats or promises were made to the Defendant in any way to obtain his statements, the Defendant was not intimidated or coerced in any way into making statements, and, finally, the agents obtained the Defendant's permission before speaking to him. Importantly, the interview took place on the Defendant's premises. The Defendant

22

Appellate Case: 11-2460   Page: 24   Date Filed: 09/26/2011 Entry ID: 3832994

makes much of the fact that the children who were on the premises were asked to leave because they informed the Defendant there was a personal matter they wanted to discuss with him.  Either the Defendant or the officers asked the  children to leave the premises.  The interview then took place, and lasted an estimated ten minutes at the place of business.  Although children were off the premises, it would appear that the Defendant's employee, Tim Hudson, was still on the premises during the time of the interview.  Thus, given the above, particularly the lack of threats or promises, and the fact that the Defendant was not restrained in handcuffs or otherwise at his place of business, the undersigned concludes that a reasonable person in the Defendant's position would not believe he was under arrest while standing in his own business talking to police officers for a total of ten minutes.

Therefore, the Defendant's argument that he needed to be given <u>Miranda</u> at this stage must fail.  Further, as stated above, no threats or promises were made to the Defendant in order to obtain his statement, and coercive or deceptive tactics were not used.  Therefore, the Defendant's statement was voluntary.

In addition, once the Defendant was removed to the county police station before any further interview took place, the Defendant was given his full <u>Miranda</u> rights by the police officers in writing, and initialed each one of those rights, and formally waived his rights by signing the waiver.  Thus, the Defendant's statements after arriving at the police station whether custodial or not, came after the Defendant was fully advised of his rights, acknowledged that he understood his rights, and waived his rights.  Further, the Defendant was not threatened in any way nor was he promised anything during his interrogation at the station.  Therefore, his statements at the police station were also voluntary.  Based on the above, the undersigned concludes that the statement of the Defendant on

Appellate Case: 11-2460   Page: 25   Date Filed: 09/26/2011 Entry ID: 3832994

January 5, 2009 should not be suppressed.  See Miranda v. Arizona, 384 U.S. 436, 467-75 (1966),

Colorado v. Bertine, 479 U.S. 367 (1987).

### E.  Consent to Search Signed on January 5, 2009

Based on the above, the undersigned concludes that the consent given by the Defendant to

search his computers on January 6, 2009 was voluntarily given, and, thus, valid.  Police may search

an item if they obtain consent from someone who has adequate authority over that item.  Consent

is voluntary if it is the product of free choice, and not given under coercion or duress.  Voluntariness

is a fact question to be determined from the totality of the circumstances present.  See Schneckloth

v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1964).  Further,

although it is one of the factors, one need not necessarily be aware that he may refuse to consent in

order to make consent voluntary.  Among the factors to be considered in determining whether

consent is voluntary include the following: the length of time the person is detained and questioned;

whether the person was threatened, physically intimidated, or punished by police; whether the

defendant relied on promises made by police, or deceptive practices by police; the age, intelligence,

education and language ability of the defendant; the degree to which the individual cooperated with

the police, and the individual's attitude about the likelihood of discovery of contraband.  See United

States v. Chaidez, 906 F.2d 377 (8th Cir. 1990); United States v. Mendenhall, 466 U.S. 544 ;

Schneckloth, supra.

Applying the above law to the present case, the undersigned concludes that the consent was

voluntary.  First, the Defendant, although in custody, was not threatened in any way to obtain his

consent to search the computer media.  In addition, he was not deceived in any way nor was trickery

used to inveigle him to consent.  In addition, the Defendant was not punished or otherwise

24

Appellate Case: 11-2460   Page: 26   Date Filed: 09/26/2011 Entry ID: 3832994

intimidated by police behavior in attempting to obtain consent.  Further, the Defendant was a person of intelligence, who had run several businesses prior to his arrest.  In addition, the Defendant had experience with the police in similar cases, having been arrested, tried, and acquitted of a prior offense.  Therefore, based on the above, the undersigned concludes that the consent to search the computer media granted by the Defendant in writing on January 5, 2009, was lawful and voluntarily given.

### Conclusion

Therefore, as stated above, all evidence seized in this matter should not be suppressed.  As to statements of the Defendant, the statements as to ownership of the box and cameras, including statements about the combination of the box, should be suppressed.  All other statements of the Defendant should not be suppressed.

* * *

In accordance with the above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. #63] be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. #64],  Defendant's Motion to Suppress Evidence [Doc. #65], and Defendant's Motion to Suppress Evidence [Doc. #90]  should be **granted in part and denied in part** consistent with the above memorandum.

Further, the parties are advised that they have fourteen  (14) days, in which to file written objections to this recommendation and determination.  Failure to timely file objections may result

in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

                                   /s/ Terry I. Adelman
                                   UNITED STATES MAGISTRATE JUDGE

Dated this  2nd  day of March, 2011.

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S3-4:10CR119 CEJ |
| | ) | |
| LELAND BEASLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

The above matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. §636(b).   Presently pending in this matter are Defendant Leland Beasley's

Motion for a Bill of Particulars.

The purpose of a bill of particulars is to apprise the Defendant of the nature of the charges

against him and to prevent undue surprise at trial.   United States v. Miller, 543 F.2d 1221, 1224

(8th Cir. 1976).   A bill of particulars is not for the purpose of a Defendant seeking or determining

the identity of witnesses to events or acts listed in the indictment.   United States v. Largent, 545

F.2d 1039 (6th Cir. 1976).   Nor is it the purpose of a bill of particulars to provide evidentiary

details or the Government's theory of the case.   United States v. Matlock, 675 F.2d 981, 986 (8th

Cir. 1982).

Given the above, the undersigned concludes that the indictment in this case is sufficiently

precise that it informs the Defendant of the charge against him in enough detail to enable him to

prepare a defense, to avoid the danger of surprise at trial, and to plead his acquittal or conviction

as a bar to further prosecution on this same offense.   See Wong Tai v. United States, 273 U.S. 77

(1927).

    In the case now at bar, the indictment in each count names the victim by specific initials or letter. The Defendant has been afforded full disclosure of the identity of those individuals both through the motion to suppress evidence, and because the Defendant has been given police reports and video tapes which will be introduced as to each count of the indictment, showing depictions of the minors whose initials are detailed in the counts of the indictment. The fact that these individually named victims were assaulted or photographed over a period of years, does not render the indictment subject to a bill of particulars. In the case now at bar, each individual subject to the video taping, photographing and assault is named in a separate count of the indictment and the approximate time frames during which the video taping and assaults took place as provided in sufficient detail so that the Defendant may prepare for his defense and plead former jeopardy. This is particularly the case because the Defendant has been provided full discovery, which obviates the need for a bill of particulars. See United States v. Giese, 597 F.2d 1170, 1180 (9th Cir. 1979). Therefore, the Defendant's motion for a bill of particulars should be denied.

    Accordingly,

    **IT IS HEREBY ORDERED** that Defendant Leland Beasley's Motion for a Bill of Particulars [Doc. #54] be **denied.**

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this _11th_ day of March, 2011.

AO 245B (Rev. 09/08)

Sheet 1- Judgment in a Criminal Case

# United States District Court
## Eastern District of Missouri

UNITED STATES OF AMERICA

v.

LELAND BEASLEY

**JUDGMENT IN A CRIMINAL CASE**

CASE NUMBER:  S3-4:10CR119 CEJ

USM Number:  37134-044

Nanci McCarthy and Michael Dwyer
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☒ was found guilty on count(s) one through twelve of the twelve-count indictment on April 15, 2011.
after a plea of not guilty

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC 2251(a) | Production of Child Pornography | January 5, 2009 | One, two, three, four, seven, eight and ten |
| 18 USC 2251(a) | Attempted Production of Child Pornography | January 5, 2009 | Five and six |
| 18 USC 2251(a) | Production of Child Pornography | January 5, 2009 | Nine |

The defendant is sentenced as provided in pages 2 through __7__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

July 5, 2011

Date of Imposition of Judgment

Carol E. Jackson

Signature of Judge

Carol E. Jackson

United States District Judge

Name & Title of Judge

July 5, 2011

Date signed

Record No.:   385

AO 245B (Rev. 09/08)  Sheet 1A - Judgment in a Criminal Case

Judgment-Page __2__ or __7__

DEFENDANT: LELAND BEASLEY

CASE NUMBER: S3-4:10CR119 CEJ

District: Eastern District of Missouri

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC2252A(a)(5)(B) | Possession of Child Pornography | January 5, 2009 | Eleven and twelve |

AO 245B (Rev. 09/08)     Judgment in Criminal Case     Sheet 2 - Imprisonment

Judgment—Page ___3___ of __7__

DEFENDANT: LELAND BEASLEY

CASE NUMBER: S3-4:10CR119 CEJ

District:   Eastern District of Missouri

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of ___3480 months.___

This term consists of a term of 360 months on each of counts one through eight and count ten, 240 months on count nine, all such terms to be served consecutively, and 120 months on each of counts eleven and twelve, all such terms to be served concurrently with each other, and concurrently with counts one through ten.

☒  The court makes the following recommendations to the Bureau of Prisons:

That defendant's federal sentence of imprisonment begin as of the date of this judgment.

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____ a.m./pm on _____

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____

☐  as notified by the United States Marshal

☐  as notified by the Probation or Pretrial Services Office

## MARSHALS RETURN MADE ON SEPARATE PAGE

AO 245B (Rev. 09/08)   Judgment in Criminal Case       Sheet 3 - Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT:  LELAND BEASLEY
CASE NUMBER:  S3-4:10CR119 CEJ
District:   Eastern District of Missouri

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of   Life.

This term consists of a term of life on each of counts one through eight and counts ten through twelve and five years on count nine, all such terms to run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☒ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☒ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment

The defendant shall comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 09/08)     Judgment in Criminal Case     Sheet 3A - Supervised Release

Judgment—Page ___5___ of ___7___

DEFENDANT:   LELAND BEASLEY
CASE NUMBER:   S3-4:10CR119 CEJ
District:   Eastern District of Missouri

## ADDITIONAL SUPERVISED RELEASE TERMS

1. The defendant shall comply with all federal, state, and local sex offender registration laws and provide verification of registration to the probation office.

2. The defendant shall participate in a sex-offense specific treatment program. The defendant shall enter, cooperate, and complete said program until released by the probation office. During the course of said treatment, the defendant shall be subject to periodic and random physiological testing which may include but is not limited to polygraph testing and/or specialized assessment instruments. The defendant shall pay for the costs associated with treatment based on a co-payment fee approved by the probation office.

3. The defendant shall be prohibited from contact with children under the age of 18 without the prior written permission of the probation office and shall report to the probation office immediately, but in no event later than 24 hours, any unauthorized contact with children under the age of 18.

4. The defendant shall be prohibited from engaging in any occupation, business, profession, or volunteer work where he has access to children under the age of 18 without prior written approval from the probation office.

5. The defendant shall not loiter within 500 feet of schools, parks, playgrounds, arcades, or other places frequented by children under the age of 18.

6. The defendant shall not possess obscene material as deemed inappropriate by the probation office and/or treatment staff, or patronize any place where such material or entertainment is available.

7. The defendant shall not purchase or maintain a post office box or any other type of private mail box without written approval of the probation office.

8. The defendant shall not enter the premises or loiter near where the victims reside, are employed or frequent except under circumstances approved in writing by the probation office.

9. The defendant shall pay the costs of any future counseling for the victims of the instant offenses, should counseling be pursued.

10. The defendant shall submit his person, residence, office, computer or vehicle to a search, conducted by the probation office based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

11. The defendant shall not possess or use any audio/visual recording or producing equipment, a computer, peripheral equipment, gaming equipment, cellular devices, or any other device with access to any "on line computer services," or subscribe to or use any Internet service, at any location (including employment) without the written approval of the probation office. If approval is given, the defendant shall consent to the probation office or probation service representative conducting unannounced examinations, including retrieval and copying of all data, of any computer(s) or computer related equipment to which the defendant has access, including web enabled cell phones and gaming systems to insure compliance with this condition and/or removal of such equipment for the purpose of conducting a more thorough inspection.

12. The defendant shall consent to having installed on the computer(s), at the defendant's expense, any hardware or software systems to monitor or filter computer use. Prior to installation of any such systems, the defendant shall allow the probation office to examine the computer and/or electronic storage device(s). The defendant shall pay for the costs associated with monitoring based on a co-payment fee approved by the probation office. The defendant shall warn any other residents, employers, or family members that the computer(s) and any related equipment may be subject to searches pursuant to this condition.

13. The defendant shall advise the probation office of all computer, electronic equipment, and web enabled equipment, including cell phones, to which he possesses or has access within 24 hours of obtaining same.

AO 245B (Rev. 09/08)    Judgment in Criminal Case      Sheet 5 - Criminal Monetary Penalties

Judgment-Page   6   of  7

DEFENDANT:  LELAND BEASLEY
CASE NUMBER:  S3-4:10CR119 CEJ
District:    Eastern District of Missouri

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on sheet 6

|            | Assessment | Fine | Restitution |
|------------|------------|------|-------------|
| Totals:    | $1,200.00  |      |             |

☐ The determination of restitution is deferred until _____ . *An Amended Judgment in a Criminal Case* (AO 245C) will be entered after such a determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant ot 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee |  | Total Loss* | Restitution Ordered | Priority or Percentage |
|---------------|--|-------------|---------------------|------------------------|
|               |  |             |                     |                        |

Totals:  _____   _____

☐ Restitution amount ordered pursuant to plea agreement   _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ The interest requirement is waived for the.   ☐ fine   ☐ restitution.

    ☐ The interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B (Rev. 09/08)   Judgment in Criminal Case   Sheet 6 - Schedule of Payments

Judgment-Page __7__ of __7__

DEFENDANT: LELAND BEASLEY
CASE NUMBER: S3-4:10CR119 CEJ
District:   Eastern District of Missouri

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  ☒  Lump sum payment of  $1,200.00  due immediately, balance due

☐ not later than _____ , or

☐ in accordance with ☐ C,  ☐ D, or  ☐ E below; or ☐ F below; or

B ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or  ☐ E below; or ☐ F below; or

C ☐  Payment in equal _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
_____ e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐  Payment in equal _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
_____ e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after Release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time: or

F ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalty payments, except those payments made through the Bureau of Prisons'
Inmate Financial Responsibility Program are made to the clerk of the court.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
  Defendant and Co-defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
  and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1 ) assessment; (2) restitution principal, (3) restitution interest, (4) fine principal,
(5)fine interest (6) community restitution.(7) penalties, and (8) costs, including cost of prosecution and court costs.



DEFENDANT: __LELAND BEASLEY__

CASE NUMBER: __S3-4:10CR119 CEJ__

USM Number: __37134-044__

## UNITED STATES MARSHAL
## RETURN OF JUDGMENT IN A CRIMINAL CASE

I have executed this judgment as follows:

_____

_____

The Defendant was delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By   _____

Deputy U.S. Marshal

☐    The Defendant was released on _____ to_____ Probation

☐    The Defendant was released on _____ to_____ Supervised Release

☐    and a Fine of_____  ☐ and Restitution in the amount of_____

_____

UNITED STATES MARSHAL

By   _____

Deputy U.S. Marshal

I certify and Return that on _____, I took custody of _____

at _____ and delivered same to _____

on _____ F.F.T. _____

U.S. MARSHAL E/MO

By DUSM _____