No. 11-2460 EMSL

**Criminal**

IN THE

**UNITED STATES COURT OF APPEALS**

**FOR THE EIGHTH CIRCUIT**

**UNITED STATES OF AMERICA**

Appellee

v.

**LELAND BEASLEY,**

Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

BRIEF OF APPELLEE

**RICHARD G. CALLAHAN**
**United States Attorney**

**ROBERT F. LIVERGOOD**
**Assistant United States Attorney**
111 S. 10th Street, Suite 20.333
Saint Louis, Missouri 63102

Attorneys for Appellee

## <u>STATEMENT AS TO ORAL ARGUMENT</u>

The Government, appellee herein, does not believe that oral argument is necessary in this case as the issues raised can be addressed by a review of the record, briefs of the parties, and application of existing law; thus, conditioned upon the Court not granting oral argument to defendant herein, the Government waives oral argument.

Should, however, the Court grant time to defendant for oral argument, the Government requests an amount of time equal to that granted to defendant to respond to such oral argument.

Appellate Case: 11-2460    Page: 2    Date Filed: 11/10/2011 Entry ID: 3848256

# TABLE OF CONTENTS

**Page No.**

STATEMENT AS TO ORAL ARGUMENT........................................................  i

TABLE OF CONTENTS........................................................................  ii

TABLE OF AUTHORITIES  ...........................................................  iv

ISSUES PRESENTED FOR REVIEW.................................................  viii

STATEMENT OF THE CASE  ...........................................................  1

STATEMENT OF THE FACTS  ...........................................................  2

SUMMARY OF ARGUMENT ...........................................................  14

ARGUMENT:

    I.      THE DISTRICT COURT PROPERLY RULED ON BEASLEY'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS........16

    II.     THE MAGISTRATE JUDGE PROPERLY DENIED BEASLEY'S MOTION FOR A BILL OF PARTICULARS.................................. 47

    III.   THE DISTRICT COURT PROPERLY APPLIED THE SENTENCING ENHANCEMENTS........................................................... 50

    IV.   THE DISTRICT COURT DID NOT IMPOSE A SUBSTANTIALLY UNREASONABLE SENTENCE AND CORRECTLY CONSIDERED SECTION 3553(a) FACTORS...........................................................54

    V.    THE DISTRICT COURT DID NOT ERR BY ALLOWING A WITNESS TO TESTIFY AS TO THE AGES OF THE CUSTOMERS OF THE STORE WHICH BEASLEY OWNED...............................56

Appellate Case: 11-2460     Page: 3     Date Filed: 11/10/2011 Entry ID: 3848256

VI.   THE DISTRICT COURT CORRECTLY GAVE THE EIGHTH CIRCUIT MODEL REASONABLE DOUBT INSTRUCTION.................................................................... 57

CONCLUSION...................................................................................... 59

CERTIFICATE OF COMPLIANCE....................................................... 60

CERTIFICATE OF SERVICE

Appellate Case: 11-2460   Page: 4   Date Filed: 11/10/2011 Entry ID: 3848256

# TABLE OF AUTHORITIES

## CASES

*Cody v. Solem*, 755 F.3d 1323 (8th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Fischer v. United States*, 425 U.S. 391 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Hall v. Iowa*, 705 F.2d 283 (8th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Missouri v. Seibert*, 542 U.S. 600 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Montejo v. Louisiana*, 129 S.Ct. 2079 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Oregon v. Elstad, 470 U.S. 298 (1985).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Amratiel*, 622 F.3d 914 (8th Cir. 2010). . . . . . . . . . . . . . . . . 20, 21

*United States v. Arciniega*, 569 F.3d 394 (8th Cir. 2009). . . . . . . . . . . . . . . 28, 32

*United States v. Banks*, 514 F.3d 769 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Barry*, 853 F.2d 1479 (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 22

*United States v. Boneshirt,* No. 10-3108, 2011 WL 5119469 (8th Cir. Oct. 31, 2011)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Borromeo*, No. 10-3229, 2011 WL 4503197 (8th Cir. Sep. 30, 2011)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Brooks,* 645 F.3d 971 (8th Cir. 2011) . . . . . . . . . . . . . . . . . . . . .25

*United States v. Chen*, 378 F.3d 151 (2nd Cir. 2004). . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . 39

Appellate Case: 11-2460    Page: 5    Date Filed: 11/10/2011 Entry ID: 3848256

*United States v. Esquivel*, 507 F.3d 1154 (8th Cir. 2007). . . . . . . . . . . . . . . . . . 16

*United States v. Feemster*, 572 F.3d 455 (8th Cir.2009). . . . . . . . . . . . . . . . . . . 54

*United States v. Fleck*, 413 F.3d 883 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Flores-Sandoval*, 474 F.3d 1142 (8th Cir. 2007). . . . . . . . . . . . . 40

*United States v. Gaines*, 639 F.3d 423 (8th Cir. 2011). . . . . . . . . . . . . . . . . . . . 51

*United States v. Garrett*, 797 F.2d 656 (8th Cir. 1986). . . . . . . . . . . . . . . . . . . . 47

*United States v. Gibson*, 105 F.3d 1229 (8th Cir. 1997). . . . . . . . . . . . . . . . . 57, 58

*United States v. Golinveaux*, 611 F.3d 956 (8th Cir. 2010). . . . . . . . . . . . 30, 31, 32

*United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . 39

*United States v. Hernandez*, 299 F.3d 984 (8th Cir. 2002). . . . . . . . . . . . . . . . . . 47

*United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993). . . . . . . . . . . . . . . . . . . . 38

*United States v. Hubbell*, 530 U.S. 27 (2000). . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*United States v. Huggans*, 650 F.3d 1210 (8th Cir. 2011). . . . . . . . . . . . . 47, 48, 50

*United States v. Jarrett James*, 571 F.3d 707 (7th Cir. 2009). . . . . . . . . 17, 18, 19

*United States v. Kon Yu-Leung*, 910 F.2d 33 (2nd Cir. 1990). . . . . . . . . . . . . . . . 38

*United States v. Lewis*, 483 F.3d 871 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 38

*United States v. Mar James*, 353 F.3d 606 (8th Cir. 2003). . . . . . . . . . . . . . . 22, 23

*United States v. Maull*, 806 F.2d 1340 (8th Cir. 1986). . . . . . . . . . . . . . . . . . . . 48

*United States v McCraney*, 612 F.3d 1057 (8th Cir. 2010). . . . . . . . . . . . . . . . . 58

v

*United States v. Muhlenbruch*, 634 F.3d 987 (8th Cir. 2011).. . . . 39, 41, 42, 43, 44

*United States v. Nunez*, 668 F.2d 10 (1st Cir. 1981).. . . . . . . . . . . . . . . . . . . . . 49

*United States v. Perrin,* No. 10-1885, 2011 WL 5105805 (8th Cir. Oct. 28, 2011) . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*United States v. Raplinger*, 555 F.3d 687 (8th Cir. 2009). . . . . . . . . . . . . . . . . . 50

*United States v. Rosso*, 179 F.3d 1102 (8th Cir.1999). . . . . . . . . . . . . . . . . . . . 58

*United States v. Saenz*, 474 F.3d 1132 (8th Cir. 2007).. . . . . . . . . . . . . . . . . 27, 28

*United States v. Simpson*, 439 F.3d 490 (8th Cir. 2006).. . . . . . . . . . . . . . . . . . 33

*United States v. Smith*, 3 F.3d 1088 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . 36, 37

*United States v. Stephenson*, 924 F.2d 753 (8th Cir.1991). . . . . . . . . . . . . . . . . 47

*United States v. Van Elsen*, 652 F.3d 955 (8th Cir. 2011). . . . . . . . . . . . . . . . . 56

*United States v. White Calf*, 634 F.3d 453 (8th Cir. 2011). . . . . . . . . . . . . . . . . 57

## **<u>CODES AND RULES</u>**

18 U.S.C. § 2251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2252A(a)(5)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 54

Fed. R. Crim. P. 7(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Appellate Case: 11-2460    Page: 7    Date Filed: 11/10/2011 Entry ID: 3848256

# UNITED STATES SENTENCING GUIDELINES

U.S.S.G. § 2G2.1(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 50, 51

U.S.S.G. § 2G2.1(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 53

Appellate Case: 11-2460     Page: 8     Date Filed: 11/10/2011 Entry ID: 3848256

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

**NO. 11-2460 EMSL**

**Criminal**

_____

**UNITED STATES OF AMERICA**

Appellee

**v.**

**LELAND BEASLEY**

Appellant

_____

Appeal from the United States District Court
for the Eastern District of Missouri

_____

===============================================

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

I.    THE DISTRICT COURT PROPERLY RULED ON BEASLEY'S MOTION
      TO SUPPRESS EVIDENCE AND STATEMENTS.

II.   THE MAGISTRATE JUDGE PROPERLY DENIED BEASLEY'S MOTION
      FOR A BILL OF PARTICULARS.

III.  THE DISTRICT COURT PROPERLY APPLIED THE SENTENCING
      ENHANCEMENTS.

Appellate Case: 11-2460     Page: 9     Date Filed: 11/10/2011 Entry ID: 3848256

IV.   THE DISTRICT COURT DID NOT IMPOSE A SUBSTANTIALLY UNREASONABLE SENTENCE AND CORRECTLY CONSIDERED SECTION 3553(a) FACTORS.

V.    THE DISTRICT COURT DID NOT ERR BY ALLOWING A WITNESS TO TESTIFY AS TO THE AGES OF THE CUSTOMERS OF THE STORE WHICH BEASLEY OWNED.

VI.   THE DISTRICT COURT CORRECTLY GAVE THE EIGHTH CIRCUIT MODEL REASONABLE DOUBT INSTRUCTION.

Appellate Case: 11-2460     Page: 10     Date Filed: 11/10/2011 Entry ID: 3848256

## STATEMENT OF THE CASE

On March 3, 2010, defendant, Leland Beasley, was indicted on five counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), and two counts of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). On June 10, 2010, and July 1, 2010, superseding indictments were filed. The third and final superseding indictment was filed January 27, 2011, charging Beasley with eight counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), involving eight different children; two counts of Attempted Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), involving two different children; and two counts of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Defendant entered his pleas of not guilty and was convicted after a trial by jury. A pre-sentence report ("PSR") was prepared by the United States Probation Office for the Eastern District of Missouri. The PSR recommended a total offense level of 52 with an advisory range of life imprisonment. Defendant was sentenced to 3,480 months imprisonment to be followed by lifetime supervision.

Defendant filed a timely notice of appeal on July 7, 2011.

Appellate Case: 11-2460     Page: 11     Date Filed: 11/10/2011 Entry ID: 3848256

## STATEMENT OF THE FACTS

Defendant, Leland Beasley, is a forty-three-year-old businessman and salesman who has a degree in mechanical engineering. Trial Tr. (Tr.) II, 227; Tr. III, 593; Tr. IV, 706 (Sentencing Transcript).  He had previous experience in the criminal justice system because he was arrested in Jefferson County, Missouri, for allegedly having oral sex with his girlfriend's son; but was not charged.  "Transcript of Hearing Before Magistrate Terry I. Adelman on August 30, 2010" (*M.H.1*) at 20.  He was also arrested in the City of St. Louis for a similar allegation, was charged with a crime, tried, and acquitted.  *Id.*

As a businessman, Beasley owned and operated several different "Gamestation Sector 19" (hereinafter, "Gamestation") stores located in the Lemay area of South St. Louis County, Missouri.  Tr. I, 185-86; *M.H.1* at 6-7.  He only had one store open at a time.  *M.H.1* at 7.  Beasley formed "Gamestation" to provide a place to play video games.  Tr. II, 176, 187.  Children paid by the hour to play games at the store.  Some of the children had memberships that would give them unlimited playing time.  *Id.* at 187.  Beasley occasionally had "lock-ins" in the store where children would pay a fee to stay from 6:00 p.m. to 6:00 a.m.  Tr. III, 443, 515, 541, 574, *but see* Tr. II, 187. If the children became tired during the lock-ins, they slept in the store.  Tr. II, 187. The store Beasley operated at the time of the police investigation was located at 710

2

Lemay Ferry Road. *Id.* at 174.

Sergeant Guinn of the St. Louis County Police Department received notification from the Missouri Children's Division about a claim that Beasley had sexually abused a child. On January 5, 2009, Guinn assigned the investigation to Detective Cavaletti of the St. Louis County Police Department. *Id.* at 172. Cavaletti went to Hancock Middle School to begin his investigation. *Id.* at 173. At the school, Cavaletti interviewed the child who was the subject of the Children's Division notification. *Id.* During the interview, the child said that Beasley touched his penis through the clothing and Beasley tried to put his hand into his pants. *M.H.1* at 5-6. The investigation expanded and several other children were interviewed. Some of the children said that they observed child pornography on a computer that was either owned by or in the possession of Beasley. *Id.*

Around 4:00 p.m. on January 5, 2009, Cavaletti and Guinn drove unmarked police cars to the "Gamestation" store located at 710 Lemay Ferry Road. *Id.* at 7-8. When they arrived, the officers observed children playing video games inside the store. Tr. II, 175*, M.H.1* at 8. When the officers entered the store they were not wearing uniforms, did not have their guns drawn, and did not display any force. Tr. II, 174-75, *M.H.1* at 8. They walked into the store and asked for Beasley. Tr. II, 175. Beasley approached the officers and identified himself. *Id.* The officers identified

3

themselves and showed Beasley their badges. *M.H.1* at 26. They told Beasley that they wanted to talk to him about a private matter. Tr. II, 175-76. Beasley then asked the children to leave and wait outside. *Id.* at 176. Beasley, who was in his forties, was nervous, as most people are when police officers arrive, but Guinn could tell he was very nervous. *Id*. at 176, 184. The officers then asked Beasley if he had any computers. Beasley told them that he had an HP laptop computer. *Id.* at 176-77. The officers asked if they could look at the computer and if Beasley would be willing to sign a consent to search form. *Id.* at 177. Beasley orally consented and signed the consent to search form at 4:06 p.m. *Id.* at 179. Beasley was not under arrest. Tr. II, 179-80. The officers did not use a show of force in order to get him to consent. The police did not display their weapons, raise their voices, threaten Beasley, or make promises to Beasley. *M.H.1* at 11-12. Beasley did not appear to be under the influence of anything that would impair his mental abilities. *M.H.1* at 11. He also appeared to understand what he was doing. *Id.* Beasley voluntarily signed a consent form allowing the officers to seize and search the computer. *Id.*; Gov. Addendum, at 6 (Consent to Search form).

The police seized the computer but did not question Beasley about the allegations of sexual abuse in the store. "Transcript of Hearing Before Magistrate Terry I. Adelman on December 9, 2010" (*M.H.2*) at 19. The officers asked Beasley

Appellate Case: 11-2460    Page: 14    Date Filed: 11/10/2011 Entry ID: 3848256

if he would accompany them to police headquarters in Clayton, Missouri. Tr. II, 179, *M.H.1* at 13. Beasley was not under arrest nor placed in handcuffs. M.H.1 at 13. Beasley sat in the front passenger seat as Cavaletti drove him to police headquarters. *M.H.2* at 20.

They arrived at police headquarters at approximately 5:00 p.m. *M.H.1* at 14. At approximately 5:05 p.m., Cavaletti and Detective Brillos of the St. Louis County Police Department asked Beasley to sign a second consent form granting the police permission to search the contents of the HP laptop computer. Tr. II, 181 *M.H.1* at 41-42. The consent form was read to Beasley by Cavaletti. *M.H.1* at 42. Beasley appeared to be listening as the form was read to him. *Id.* at 43. Beasley freely and voluntarily signed the form. *Id.* at 43-44; Gov. Addendum, at 7 (Consent to Search form). No threats or promises were made to Beasley nor were any weapons drawn nor were voices raised. *M.H.1* at 44. There was no show of force. *Id.* Beasley was not handcuffed. *Id.* at 53. Beasley did not appear to be under the influence of drugs or alcohol. *Id.* at 44. Beasley appeared to understand what he was doing. *Id.* After Beasley signed the second consent to search form, Cavaletti and Guinn interviewed Beasley.

At approximately 5:30 p.m., Cavaletti and Guinn entered the interview room. *Id.* at 14-16. Beasley was not under arrest. *Id.* at 15. He was not handcuffed and the

Appellate Case: 11-2460   Page: 15   Date Filed: 11/10/2011 Entry ID: 3848256

officers were not wearing weapons. *Id.* Beasley had not requested an attorney nor had he indicated that he wished to remain silent. *Id.* at 15-16. Cavaletti read the *Miranda* rights to Beasley. *Id.* at 16. Beasley looked at the form as Cavaletti read it to him and indicated that he understood his rights. *Id.* at 16-17. Beasley initialed next to each right indicating that he understood the right. *Id.* at 17; Gov. Addendum, at 8 (Warning and Waiver Form); *M.H.1* at 17-18. Beasley signed the Warning and Waiver form around 5:30 p.m. on January 5, 2009. Tr. II, 183-84, *M.H.1* at 18. Beasley also orally acknowledged that he understood his rights and was willing to speak with the officers. *M.H.1* at 19.

During the course of the interview, Beasley never indicated that he wished to remain silent nor did he ask for an attorney. *Id.* The police did not threaten nor promise anything to Beasley in order to induce him to waive his rights or to continue to waive his rights. *Id.* There was no type of intimidation whatsoever. *Id.* at 19-20. Beasley was not in custody. *Id.* at 29. During the interview, Beasley said, among other things, that he was arrested in Jefferson County for allegedly having oral sex with his girlfriend's son, but was never charged with a crime. *Id.* at 20. He also said that he was arrested in the City of St. Louis for a similar allegation, was charged with a crime, tried, and acquitted. *Id.*

During the course of the interview the police told him about the allegations the

6

children had made against him. Tr. II, 189. At some point after that he became emotional and started crying. Near the end of the interview Beasley said that he thought that he needed some help. *Id.* When the police asked him what he needed help for, he would not elaborate. *Id.* When the police asked him again why he needed help, he said that he was embarrassed. *Id.* The interview concluded around 7:45 p.m. *Id.* After the interview ended, Beasley was charged in the State of Missouri with Child Molestation in the First Degree pertaining to one of the children that Cavaletti had interviewed. Tr. II, 189-90, *M.H.2* at 33.

On January 7, 2009, Beasley was arraigned on the State of Missouri charge and an attorney entered her appearance on behalf of Beasley.

On January 13, 2009, Guinn went to meet Mary Day, Beasley's ex-wife, after she telephoned and indicated she might have some information. Tr. II, 192. Day told Guinn that she had found some CDs in Beasley's truck. When she examined the CDs, she observed images of child pornography and turned the disks over to the local police. *Id.* at 218-21. After receiving this information, Guinn made arrangements with the police department to retrieve the disks. Cavaletti then seized the CDs. *Id.* at 193.

As the investigation continued, Guinn learned that Beasley telephoned Tim Douglas, his employee at the "Gamestation" store, from jail. During that

7

conversation, Beasley asked Douglas to take some items from Beasley's "Gamestation" store to Leslie Moss' residence, Beasley's mother. *M.H.1* at 21. Tim Douglas testified at trial that Beasley called from jail and asked him to take two duffle bags of clothing, a black lockbox (Gov. Ex. 11), and a camera bag (Gov. Ex. 12) to Moss' house. Tr. III, 449. There was no testimony that Beasley instructed Douglas not to go through the items.

Beasley testified at trial that he telephoned Douglas from jail and asked Douglas to take anything that was behind the counter to his mother's house. *Id.* at 584. He said that employees and customers had access to the items behind the counter. *Id.* at 584-85. He testified that he and employees put things into the black lockbox. *Id.* at 606. Once the items were taken to his mother's house, Beasley testified that he had her go through the items. He testified that he telephoned his mother from jail and asked her to go into his green bag and get some disks and destroy them (no disks were found in the bag by the police). He also asked her to go into one of the bags and get some medicine and destroy a tube of medicine if the tube was empty. *Id.* at 587-88, 610.

On January 16, 2009, Cavaletti reviewed the CDs that Day had informed the police about. He observed images of child pornography on the CDs including images of a child he had interviewed during the course of his investigation. *M.H.2* at 39.

8

This child was not the victim of the pending State charges against Beasley. *M.H.2* at 44-46. The child in the images appeared to be asleep with his penis exposed. *Id.* It appeared that the picture was taken in Beasley's store. *Id.* at 43.

Later on January 16, 2009, Guinn met with Moss. *See M.H.1* at 21-22; *M.H.2* at 40. He identified himself as a police officer. *M.H.1* at 32-33. During their meeting Guinn asked her for consent to seize the items taken from the "Gamestation" store to her house. *Id.* at 22, 34. There was no testimony that Beasley ever limited Moss' access to the items. Moss told Guinn that the items belonged to Beasley and were brought over to her house. *Id.* at 22. She said that Beasley did not reside with her at her house, but he used the address for his driver's license and other legal purposes. *Id.* at 23. Guinn believed that Ms. Moss had the ability to grant consent so that he could seize the items. *Id.* Moss signed the consent form. *Id.* at 22. If Ms. Moss would not have given consent, Guinn planned to apply for a search warrant to seize the items. *Id.* at 23-24. The contents of the items seized by Guinn (Sony digital camera, Sony digital video recorder, a black lockbox that had a combination-type lock, a Canon camera bag) were not searched, other than a bag of clothing, until Beasley also consented to searching the items. *Id.* at 24, 34-5, 49. The bag of clothing was left at Moss' house. *Id.* at 35.

The officers decided to question Beasley about a new crime based upon images

9

of child pornography that Cavaletti viewed when he examined the CDs that Day had previously informed the police about. *M.H.1* at 48, *M.H.2* at 45. In connection with their planned interview, the officers contacted a State Assistant Prosecuting Attorney concerning obtaining consent from Beasley to search the items seized from Moss' residence and, if he refused to give consent, obtaining a search warrant to search the items. *M.H.2* at 46-7.

On January 19, 2009, around 12:30 p.m., Cavaletti and Brillos went to St. Louis County Justice Center where Beasley was being held and transported him to police headquarters. *M.H.1* at 45, 53. The officers took Beasley to an interview room. Once Beasley was in the interview room, the officers went to another nearby interview room. *M.H.2* at 47-8. In this second interview room, they laid out the evidence seized from Moss' residence so that Beasley would know what the officers wanted to search. *Id.* at 48. The officers then took Beasley to the second interview room. When Beasley saw the items, he asked the officers what they wanted. The officers asked Beasley for consent to search the items, to which he orally agreed. *M.H.2* at 48, *c.f. M.H.1* at 47 (Brillos testified that when Beasley saw the evidence he questioned whether the black lockbox was his. Cavaletti then had a conversation with Beasley about the black lockbox). The officers then returned with Beasley to the first interview room where they asked him to sign a consent to search form.

10

Cavaletti said that they then returned to the first interview room. There, Beasley asked how was he to know whether the black lockbox was his. *M.H.2* at 49. At this point there was a conversation concerning the black lockbox and its combination. The district court suppressed the conversation wherein Cavaletti explained to Beasley that he "knew it was his box but we just wished to have consent to get into it. [Cavelleti] asked if he had a box that was similar to that box, he said, 'Yes.' [Cavelleti] asked if he had a box that had a lock combination on it. He said 'Yes' and [Caveletti] asked him for a lock combination so [they] could try it, see if it was his box instead of having to pry it open and he said he forgot his lock combination." *Id.* at 49.

Beasley at no time withdrew his consent to search. *Id.* at 50. Beasley then signed a consent to search form after the police went over it with him. *Id.* at 50-51. The police did not threaten Beasley nor promise anything to him in order to induce him to sign the consent form. *M.H.1* at 47. The consent to search form was read to Beasley before he signed it and Beasley appeared to understand what was being read to him. *Id.* at 48. At no point did Beasley indicate that he did not want to sign the form. *Id.* He did not ask for counsel. *Id.* at 46. No threats or promises were made in order to induce him to sign the form. *Id.* at 47. Around 12:50 p.m. on January 19, 2009, Beasley signed the consent to search form for the Sony Model DSC-W100 and

11

the Sony Handycam DCR-SR80. *Id.* at 48, Gov. Addendum, at 10 (Consent to Search form).

Beasley was also presented with a consent to search form to search the black lockbox. *Id.* at 49. Officers also read that form to him. *Id.* at 49. Likewise, around 12:50 p.m. on January 19, 2009, Beasley signed the consent to search form for the black lockbox. *M.H.1* at 50; Gov. Addendum, at 9 (Consent to Search form).

Beasley was next advised of his *Miranda* rights. *M.H.1* at 50. At that point Beasley invoked his rights by asking for an attorney. *Id.* at 51. Beasley was not asked any other questions and was taken back to the Justice Center about 1:30 p.m. *Id.* at 51, 57.

The investigation continued, including searching the cameras, disks, and black lockbox. Inside the black lockbox were several items including a Sony Handycam camera, computer disks, and video tapes. Tr. II, 245-47. The computer disks and cameras were forensically examined. Also, the video tapes were viewed. The forensic examination revealed child pornography videos, and images of the victims. Some of the videos depicted Beasley attempting to take the clothes off of children as they slept. Some of the videos depicted additional victims such as M.T. and M.H. Many of the videos only depicted Beasley's hand undoing the children's pants as they slept and fondling them. In one of the videos, the child victim woke up and said

Appellate Case: 11-2460     Page: 22     Date Filed: 11/10/2011 Entry ID: 3848256

Beasley's name. In another video, a profile of Beasley's face is seen as he attempted to undo a child's pants while he slept. In another, Beasley's whole body is seen, including his face, as he engaged in sexual relations with a child, M.T.

Appellate Case: 11-2460    Page: 23    Date Filed: 11/10/2011 Entry ID: 3848256

# SUMMARY OF ARGUMENT

Defendant's "Summary of Issues" raise six points for appeal. Defendant claims that the district court erred in denying, in part, his motion to suppress evidence and statements. The district court correctly refused to suppress the statements made on January 5, 2009, and correctly found that the statements were voluntarily made both prior to being placed in custody and after defendant was advised of his *Miranda* rights. The district court properly also refused to suppress the evidence seized from Moss' residence because it was lawfully seized and searched.

The magistrate judge properly denied the defendant's motion for a bill of particulars because the indictment, together with the discovery provided, was sufficiently precise that it informed Beasley of the charge against him in enough detail to enable him to prepare a defense, to avoid the danger of surprise at trial, and to plead his acquittal or conviction as a bar to further prosecution on this same offense.

The district court correctly applied U.S.S.G. § 2G2.1(b)(1)(A), finding that B.E.N., the victim in Count One, was under the age of twelve when Beasley produced the child pornography of him. The district court also correctly applied U.S.S.G. § 2G2.1(b)(5), finding that the victims in Counts One through Six were in Beasley's care, custody, or supervisory control when he produced or attempted to produce child

14

pornography videos of them.

Defendant's sentence was not substantively unreasonable considering the egregiousness of his actions and the number of children that he victimized. The district court properly considered the factors set forth in 18 U.S.C. § 3553(a).

The district court correctly ruled that witness Douglas could testify as to the ages of the "Gamestation" customers, because such opinion testimony was properly based on his observations.

The district court correctly gave the Eighth Circuit Model Reasonable Doubt instruction to the jury. This instruction has been repeatedly upheld by this Court.

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY RULED ON BEASLEY'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS.

### A. Standard of Review

In reviewing suppression issues, a district court's factual findings are reviewed for clear error, and its legal conclusions de novo. *United States v. Esquivel*, 507 F.3d 1154, 1158 (8th Cir. 2007). The district court's decision on a suppression motion is affirmed "unless it is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, [the Court is left] left with the definite and firm conviction that a mistake has been made. Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support a conclusion." *Id.* (citations and internal quotation marks omitted).

### B. Argument

1. **The district court properly found that Beasley's mother, Leslie Moss, had authority to permit the officer to enter and search her home, and to seize defendant's belongings because there was no evidence that Beasley lived at her house and no evidence that Beasley instructed Douglas or Moss not to look at the items or not to show them to anyone else.**

    a.    *Moss had authority to permit the police to enter her home*

16

> *and seize Beasley's items that Douglas had brought to her house.*

The district court properly found that Moss had authority to permit the police to enter her residence and search and seize the items inside. The district court relied on *United States v. Jarrett James*, 571 F.3d 707 (7th Cir. 2009). In *Jarrett James*, the defendant was suspected of committing two robberies. During the investigation, officers interviewed defendant's mother. She said that she found a gun in her residence when the defendant lived with her. She told him to remove the gun. The defendant later rented his own apartment but was arrested and incarcerated. When his lease expired, his mother retrieved defendant's belongings from the apartment and brought them back to her house. *Id.* at 710-11.

Defendant's mother later contacted the police to tell them that she had received a letter from the defendant that there was a gun inside her residence in a safe that belonged to him. She also told them that she would not open the safe before the police came to her residence. The police then went to her house. Once at the residence, she opened a closet door and pointed to a safe on the floor. She told the police that the safe belonged to defendant. The officer said that he intended to seize the safe. Defendant's mother did not object, but remained silent. His mother gave the police the keypad code for the safe. *Id.* at 711. A search warrant was then issued to

Appellate Case: 11-2460     Page: 27     Date Filed: 11/10/2011 Entry ID: 3848256

search the safe.

The court noted that:

> if "law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant," seizure of the property is permitted "pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present."

*Id.* at 713 (citation omitted). The court then addressed that a recognized exception to a search warrant was third-party consent. The court wrote that "where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *Id.* at 713-14 (citations omitted). The defendant in *Jarrett James*, just as here, argued that his mother had neither actual nor apparent authority to consent. *Id.* at 714.

There the court found that defendant's mother had authority to consent to the seizure of the safe. As to the initial seizure of the safe, the court said that defendant's mother had authority to consent if: "(1) she had joint control or access to the safe itself (regardless of whether she had access to the contents of the safe) (actual authority); or (2) it was reasonable for police to believe she had joint control of or access to the safe itself (apparent authority)." *Id.* The court found that even though the safe only contained the defendant's belongings, his mother "exercised control over

18

the safe itself.  There [was] no evidence that [defendant] attempted to limit or restrict her control over the safe. . . .  Even if [defendant] had not granted actual authority to [his mother], she had apparent authority because a reasonable person, given the information that [police officer] possessed, would believe that [she] had joint control of the safe."  *Id.*

Moss, like Jarrett James' mother, had authority to permit the police to enter into her house.  She was the owner of the house.  *M.H.1* at 23.  There was no limitation on Moss' authority over her house.  According to Moss, Beasley had not lived with Moss at the time he was arrested.  *Id.*  Furthermore, Beasley indirectly acknowledged that he did not live at Moss' residence when he told Douglas to take the items to his *mother's* house; he did not tell Douglas to take the items to his house.  Tr. III, 456.  Moss also had actual authority or apparent authority over the items that Douglas brought to her house.  Thus, Beasley assumed the risk that Moss would allow someone access to the items.

Furthermore, the officers could rely on Moss' apparent authority, even if she did not have actual authority.  The officers knew that the items were in Moss' residence, defendant did not live at Moss' residence, and it was Moss who pointed the items out to the officers: "she took me to a back room in the residence and identified several items, canvas bag that had a DVD recorder in it and Sony camera,

19

digital camera, a Sony digital recorder along with a strong box that she said was brought over to her house, belonged to Leland." *M.H.1* at 22. Thus, Moss had authority to permit the officers to seize the items.

Another example of this Court finding that the police reasonably relied on the apparent authority is found in *United States v. Amratiel*, 622 F.3d 914 (8th Cir. 2010). There, police officers responded to a domestic disturbance call at the Amratiel's residence. When the officers arrived, Hibdon, Amratiel's wife, was at a neighbor's house and Amratiel was still inside his residence. Hibdon told the officers that Amratiel chased her around the house with a sword. *Id.* at 915. Eventually, the officers were able disarm Amratiel and place him in the patrol car. *Id.* The officers were concerned about weapons being in the house and asked Hibdon for permission to search the residence. Hibdon agreed to permit the search and signed a permission to search form. *Id.* In the garage was a locked gun safe. Hibdon told the officers that her husband had the keys to the safe. The officers retrieved the keys from Amratiel who was still in the patrol car. The officers opened the safe and found firearms and a hand grenade. *Id.*

Amratiel argued that it was unreasonable for the officers to rely on Hibdon's apparent authority over the gun safe because he possessed the key. The court found that the officers' reliance was reasonable because they knew the safe was in the

20

garage which was a common area, that Hibdon knew that Amratiel had the keys on his person, that she never said that she did not have access to the safe or that it was for his exclusive use, and as the officers opened the safe, she identified one of the guns as her own. *Id.* at 916. The court also relied on Amratiel's failure to object to the officers removing the key from him. *Id.*

What is significant about *Amratiel* as it relates to the instant offense is that Moss had access to the black lockbox because it was in her residence and defendant did not reside there. While the black lockbox was never opened by the police in her presence, she never told Guinn that she did not have access to it. Finally, and most significant for the case at hand, is that when the black lockbox was shown to Beasley on January 19, 2009, he did not object to the officers having the box, but instead orally and in writing consented to the search of its contents.

During trial, it also became apparent that Beasley did not have an expectation of privacy in the contents of the items that were taken to his mother's house. He testified that he asked Douglas to take anything that was behind the counter to his mother's house. Tr. III, 584. He said that employees and customers had access to the items behind the counter. *Id.* at 584-85. He testified that he and employees put things into the black lockbox. *Id.* at 606. He never testified that he was the one who locked the black lockbox or how it got locked.

21

Likewise, once the items were taken to his mother's house, he testified that he had her go through the items. He testified that he telephoned his mother from jail and asked her to go into his green bag and get some disks and destroy them (no disks were found in the bag by the police). He also asked her to go into one of the bags and get some medicine and destroy a tube of medicine if the tube was empty. *Id.* at 587-88, 610. He never testified that he instructed his mother not to go through his things or not to show anyone his things.

This is not a situation, as Beasley claims, like that in *United States v. Barry*, 853 F.2d 1479 (8th Cir. 1988). In *Barry*, the court found that defendant had retained a personal and reasonable expectation of privacy in locked suitcases. *Id.* at 1480. In the instant case, other than perhaps the contents of the black lockbox, others had access to the contents of the items that were eventually seized. As far as the black lockbox, the officers did not open the black lockbox until Beasley gave his consent.

Likewise, this is not a situation like that in *United States v. Mar James*, 353 F.3d 606 (8th Cir. 2003). In *Mar James*, the defendant was arrested and held in jail. While in jail, he tried to smuggle a letter to his friends. The letter was intercepted and shown to law enforcement. The letter instructed his friends to contact Michael Laschober and have him destroy Mar James' CDs that he had in his possession. *Id.* at 610.

<center>22</center>

Law enforcement acted on the information and approached Laschober. When Laschober indicated that Mar James had given him CDs, he volunteered to get them for the police. Laschober retrieved a brown sealed envelope from his residence. When the officers asked him if he knew what is inside, he said that he thought it contained disks. Laschober eventually permitted the officers to open the envelope. Inside the envelope were disks. Laschober then consented to the police seizing the disks and signed a consent form. *Id.* at 611

The police took the disks back to the station and viewed the contents of the disks on a sophisticated computer that was able to open the disks for viewing. *Id.*

The court reversed the district court and found that Laschober was Mar James' bailee. The court found that Mar James did not give Laschober permission to exercise control over the disks or consent to the searching of the disks. *Id.* at 614. Furthermore, law enforcement could not reasonably believe that Laschober had authority to consent because at the time of the seizure, law enforcement knew, among other things, that because they intercepted and read Mar James' letter, that the only authority Laschober had over the items was to destroy the disks. *Id.* at 615. This was the critical fact.

Here, the police were not aware of any special instructions given to Moss. *See M.H.2* at 68. As the magistrate judge concluded, there were no limitations placed on

23

Moss' access to the cameras and black lockbox (whether or not she had access to the contents), that she had apparent authority to allow the police officers to seize the items. *See* Appellant Addendum, at 9 ("Memorandum and Recommendation of United States Magistrate, Doc. # 140, March 22, 2011"). Therefore, the police could rely on Moss' authority to permit them to seize and search the items. Even though she had authority over the items, other than the bag of clothes, nothing was searched by the police officers until Beasley granted permission on January 19, 2009.

Although defendant makes an assertion that the officers knew that Moss did not have actual authority, the evidence is to the contrary. All that the officers knew was that defendant had requested Douglas to take the items to his mother's house. *M.H.1* at 21. Beasley also argues that Douglas did not have authority to search the items. There is no evidence that Beasley ever limited Douglas' access to the items. Beasley merely requested that Douglas take the items to his residence. Tr. III, 448-49, 456-57, 584.

> b.   *Even if Moss' consent was not valid, the items could be properly seized under the plain view exception.*

Under the plain view doctrine, a police "officer can seize evidence without a warrant when (1) the officer does not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating

24

character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Brooks*, 645 F.3d 971, 975 (8th Cir. 2011) (citations omitted). Beasley claims that the items were not in plain view because the officers asked Moss to retrieve the items. However, the magistrate found: "Apparently, Douglas told the detectives about seven specific items. Pursuant to this information, Sgt. Guinn went to Beasley's mother's house. . . . Guinn asked Moss if he could view the items, and if he could take them from her. She led Guinn to a bedroom and showed him several items left by Douglas." Appellant Addendum, at 5; *see also M.H.1* at 22. Thus, as soon as Guinn observed the items, he could have seized them under the plain view doctrine. As the magistrate judge noted:

> At the time the two digital cameras and the lock box were displayed to the police officers, they were aware that several minor children had been sodomized or otherwise molested by the Defendant. They were also aware that the Defendant had a large collection of child pornography, and the Defendant had filmed or taken a picture of at least one of their victims, and that video tape or picture existed showing the genital area of this victim. They were aware that the background in the picture of the victim in an unclothed state appeared to be at the Gamestation store. They were aware that [Douglas] had retrieved the box and the cameras from the game store. This being the case . . . they had reason to believe that the two cameras might be evidence of a crime, since they were originally at the Gamestation store, and since they had evidence that the Defendant was filming or producing child pornography on those premises. In addition, it was readily apparent to them that the lock box might contain evidence of criminal activity. In this regard, they have been given [computer disks] of child pornography which the Defendant secreted in his vehicle, and it was likely, given the fact that the lock box was stored at the premises with the cameras, that the lock box also contained evidence of criminal activity.

Appellate Case: 11-2460     Page: 35     Date Filed: 11/10/2011 Entry ID: 3848256

Appellant Addendum, at 10-11.

As far as the alleged search of the camera bag, even if the bag was closed and locked, the officers could have opened it under the plain view doctrine. In *United States v. Banks*, 514 F.3d 769 (8th Cir. 2008), defendant's girlfriend gave officers permission to search her apartment where she stayed with the defendant. She told the officers that they would find marijuana in her bedroom closet. Then they went into the bedroom closet, there was a zippered gym bag that contained a locked plastic container bearing the words Phoenix Arms, and other items. *Id.* at 772. The officer loosened the hinge on the Phoenix Arms container and seized a pistol and ammunition. *Id.*

The court of appeals found that "like objects that sit out in the open, the contents of some containers are treated similarly to objects in plain view." *Id.* Individuals possess a lesser expectation of privacy in the contents of single-purpose nature of a container.

Beasley's camera case was such a container. It was a camera case marked with "Canon." The officers had probable cause to search for cameras and, therefore, could have opened the camera case, even if it were locked, to search the contents for a camera. The camera case, however, was not locked.

**2. The district court properly found that Beasley's January 19,**

**2009, consent to search the cameras and black lockbox was voluntary.**

On January 19, 2009, Cavaletti and Brillos met with Beasley to investigate new charges concerning the child pornography images that Cavaletti had observed on the computer disks that Ms. Day had discovered. *M.H.1* at 48; *M.H.2* at 45. The officers met with Beasley to seek his permission to search the cameras and black lock box to investigate child pornography, not to investigate the child molestation charges then pending against Beasley. *M.H.2* at 45. Beasley's consent to search the cameras and black lockbox given on January 19, 2009, as part of the investigation was voluntary.

> The voluntariness of a consent to a search is a factual question that is reviewed for clear error. A consent is voluntary if the consenting individual had 'a reasonable appreciation of the nature and significance of his actions.' Consent can be given orally or in writing, and it is not necessary to use a written consent form. We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary. The government must prove by a preponderance of the evidence that the consent was voluntary.

*United States v. Saenz*, 474 F.3d 1132, 1136-37 (8th Cir. 2007) (citations omitted).

The Court examines the totality of the circumstances to determine if consent was voluntary. The following factors are relevant to determining whether consent was voluntary: 1) the subject's age; 2) the subject's general intelligence and education; 3) whether the subject was intoxicated at the time; 4) whether the subject

27

consented after being informed of his *Miranda* rights; 5) whether the subject was aware of his rights and protections due to previous arrests; 6) the length of time the subject was detained; 7) whether the officers acted in a threatening manner; 8) whether any promises or misrepresentations were made; 9) whether the subject was in custody or under arrest at the time; 10) whether the consent occurred in public; and 11) whether the subject was silent as the search was conducted. *Id.* at 1137; *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009).

Applying these factors to the instant matter, Beasley's consent was voluntary because (1) as to his age, he was in his forties; (2) he appeared to understand what he was doing when he gave consent; (3) he did not appear to be under the influence of substances that would impair his mental abilities; (4) although he was not read his *Miranda* rights immediately before the request for consent was made, he was familiar with his *Miranda* rights because he was informed of them approximately two weeks earlier; (5) he was aware of the protections that the legal system provides because of his prior experience of twice being arrested for molesting a child, and on one of those occasions being charged, tried and acquitted; (6) Beasley had been in jail for approximately two weeks but he was in police custody for only a short time on January 19, 2009; (8) the police did not promise him anything; (9) the consent to search was requested of him while he was in custody; (10) he did consent to the

28

search while at police headquarters; and (11) he did not object to the officers asking for consent, he did not question how the officers obtained the items that they were asking permission to search,  and there was no evidence that he ever tried to revoke his consent.

Beasley claims that there was a prolonged conversation about the combination and ownership of the black lockbox and that he was forced to comment on his ownership of the safe.  This assertion is not supported by the evidence.  On January 19, 2009, Cavaletti and Brillos went to the St. Louis County Justice Center to bring Beasley to the St. Louis County Police Department.  When they brought Beasley to the police department, the officers put Beasley in an interview room  and in another room, the officers laid out the items that had been seized from Moss' residence.  The officers then showed Beasley the items they laid out.  Beasley stood there for a second and asked what they wanted.  They asked him for consent to search the items. He orally gave them consent to search the items.  The police then returned Beasley to the interview room, which was right next to the room they were just in. Brillos then asked Beasley to sign the consent to search form for the cameras, which he did. *M.H.1* at 45-50; *M.H.2* at 48-51; Tr. II, 234-36.

After defendant signed the consent to search for the cameras, he was asked to sign the consent to search for the black lockbox.  It was at this point that the Beasley

Appellate Case: 11-2460     Page: 39     Date Filed: 11/10/2011 Entry ID: 3848256

asked about how he would know whether the black lockbox was his. Cavaletti explained to Beasley that he "knew it was his box but we just wished to have consent to get into it. [Cavellleti] asked if he had a box that was similar to that box, he said, 'Yes.' [Cavelleti] asked if he had a box that had a lock combination on it. He said 'Yes' and [Caveletti] asked him for a lock combination so [they] could try it, see if it was his box instead of having to pry it open and he said he forgot his lock combination." *M.H.2* at 49. Defendant did not withdraw his oral consent, and after a moment of silence, signed the consent to search form for the black lockbox. *Id.* at 50.

Contrary to Beasley's assertion, there was nothing coercive about the conversation about the black lockbox. In fact, it was Beasley who brought up the topic. Cavaletti just responded to Beasley's statement. Beasley "signed the written consent form after only a short hesitation." *Id.* at 18. The detectives never raised their voices and did not attempt to intimidate or coerce him. *Id.* And, as the magistrate judge pointed out, the defendant had signed a consent form allowing the detectives to search his computer only thirteen days before. Thus, the police did not coerce Beasley's consent.

In *United States v. Golinveaux*, 611 F.3d 956 (8th Cir. 2010), a Wal-Mart loss prevention officer observed Golinveaux take cold medicine that contained

30

pseudoephedrine from the store without paying for it. *Id.* at 597. Pseudoephedrine is a precursor for the manufacture of methamphetamine. The loss prevention officer took Golinveaux and her companion to the store's loss prevention office where they waited for police. When the officers arrived, one of the officers asked for consent to search her car. Golinveaux refused and requested to speak to a lawyer. *Id.* at 957.

The officer then called his commanding officer who came to the scene and was informed what Golinveaux had said. The commanding officer entered the room where Golinveaux was located. The room contained six to seven people. Golinveaux, who was seated at a table, felt physically intimated in the room because she was the only woman present. The commanding officer told Golinveaux that he knew she had asked for an attorney and would not ask any her questions about the theft. He then gave her a "dangerous chemical speech" about the danger her car might be to other people if it contained other precursors for the manufacture of methamphetamine. *Id.* at 958. Golinveaux reportedly told the commanding officer there was nothing illegal in her car. *Id.*

About thirty-eight minutes after the first officers arrived, and twenty-three minutes after the commanding officer was dispatched to the store, Golinveaux consented to the search of the car as long as she could be present. Golinveaux led the officers to her car and unlocked it. Drug paraphernalia and a loaded gun were located

31

in the car.  Golinveaux was then placed under arrest and was given her *Miranda* rights.  *Id.*

Golinveaux was indicted for being a felon in possession of ammunition as a result of having been previously convicted of three or more violent felony offenses *Id.*  After being indicted for being a felon in possession of ammunition, Golinveaux moved to suppress the evidence seized during the search.  Golinveaux appealed the district court's refusal to suppress the evidence claiming that her consent was not voluntary.   The court applied the *Arciniega* factors, *supra*, and found that Golinveaux's consent was voluntary.  The court held:

> At most, Golinveaux was in police custody for thirty-eight minutes before she gave consent to search, and was subject to the possible physical intimidation described above and [the commanding officer's] "dangerous chemical speech" for less than twenty-three minutes.  We do not believe, in such a short time, an experienced criminal such as Golinveaux-particularly given her history of assaulting law enforcement officers-was so overcome by police authority or by the [commanding officer's] persuasive powers as to make her consent involuntary.

*Id.* at 960.  Beasley, like Golinveaux, was in the officers' custody for only a short period of time.  Beasley was in the officers' custody at about 12:30 p.m. on January 19, 2009.  By 12:50 p.m., he had been transported from the Justice Center to police headquarters,  given his oral consent to search the cameras and black lockbox, and signed the consent to search forms.  *M.H.1* at 45, 53, 55, 58.  He, like Golinveaux,

Appellate Case: 11-2460     Page: 42     Date Filed: 11/10/2011 Entry ID: 3848256

was experienced in the criminal system. Beasley had previously been arrested two times before regarding allegations of child molestation, and on one of those occasions, he went through the entire legal system, including a trial that resulted in an acquittal. *M.H.1* at 20. Therefore, considering these factors as well as that Beasley was a college-educated businessman, Beasley would not have been so overcome by police authority as to make his consent involuntary.

Furthermore, Beasley, unlike Golinveaux, had additional factors that supported the district court's finding of voluntariness. Approximately two weeks earlier Beasley had given consent to search an HP computer from his store and signed consent forms. In addition, he had also been informed of his *Miranda* rights two weeks earlier. Thus, considering all the circumstances, Beasley's consent to search was voluntary.

### 3. The district court correctly refused to suppress evidence derived from the consent to search under the fruit of the poisonous tree doctrine.

The district court correctly refused to suppress the evidence that Beasley consented to be searched on January 19, 2009, based upon the fruit-of-the-poisonous-tree doctrine. The fruit-of-the-poisonous-tree doctrine "bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." *United States v. Simpson*, 439 F.3d 490, 493 (8th

33

Cir. 2006) (citation and internal quotation marks omitted).

Beasley contends that the district court should have suppressed the cameras because the district court suppressed the statements made by Beasley on January 19, 2009, concerning the identification of the items. The statement defendant made, however, did not lead to the discovery of the evidence. The police had already seized the items from Moss' residence. The officers' purpose of meeting with the Beasley was to investigate new charges of child pornography. *M.H.1* at 48, *M.H.2* at 45. The magistrate judge concluded, however, that the investigation of the child pornography was close enough to the pending charges against Beasley that there was a possibility that the Sixth Amendment right to counsel had attached. Appellant Addendum, at 18-19. Based upon the possible attachment of the Sixth Amendment right to counsel and that Beasley was in custody for the purposes being given his *Miranda* warnings and he was not yet given his *Miranda* rights on that day, the magistrate judge recommended that Beasley's statements concerning the ownership of the black lockbox be suppressed. *Id.* Nevertheless, the magistrate judge found that Beasley voluntarily made the statements. *Id.* at 19. The district court adopted the magistrate judge's recommendations. Gov. Addendum, at 2 ("Order Adopting Report and Recommendations, Doc. # 160, April 1, 2011").

Regarding statements that are made voluntarily, the court has "refused to

Appellate Case: 11-2460    Page: 44    Date Filed: 11/10/2011 Entry ID: 3848256

extend the fruit-of-the-poisonous-tree doctrine to exclude physical evidence derived from a voluntary statement made in the wake of a *Miranda* violation." *United States v. Fleck*, 413 F.3d 883, 893 (8th Cir. 2005). In *Fleck*, police officers responded to a house owned by Robert and Ken Fleck and their sister to investigate stolen property. *Id.* at 888. The officers asked permission to enter the residence and look around. Once possible stolen property was observed, detectives were called to assist. When the detectives arrived, one of the detectives went inside the Flecks' residence and asked for permission to search the house. Ken Fleck signed a consent form. Five people, besides the officers, were in the house. Some of the officers stayed with the five while others searched the residence. While searching the residence, the officers found a bedroom that was padlocked. They asked the five people whose bedroom it was. Robert said that the bedroom was both Ken's and his, and Ken agreed. *Id.* at 888-89. Robert said that he had the key and gave it to a detective. When the officers searched the bedroom they found guns, among other things. An officer then asked the Flecks who owned the guns and Robert and Ken said that the guns belonged to both of them. The Flecks were not given their *Miranda* warnings and were arrested. *Id.* at 889.

The Flecks moved to suppress, among other things, the guns found in the bedroom as fruit of the poisonous tree because neither of the Flecks were advised of

Appellate Case: 11-2460    Page: 45    Date Filed: 11/10/2011 Entry ID: 3848256

their *Miranda* rights before or during the search and because the detective's request for the key was an interrogation. *Id.* at 891. The court found that even assuming that asking for the key was an interrogation, the guns were still admissible. *Id.* at 892-93. The statements the Flecks made were all voluntary even though *Miranda* rights were not given. *Id.* at 893. Because the Flecks statements were voluntary, the guns were not subject to suppression. *Id.*

Here, Beasley's statements, like the Flecks' statements, were voluntarily made. The police did not threaten him, promise him anything, or in anyway force him to make the statements. Therefore, the cameras should not be excluded under the fruit of the poisonous tree doctrine.

> ### 4. The district court properly found that Beasley's consent to search given on January 19, 2009, was not an interrogation.

The district court correctly found that Beasley's consent to search was not an interrogation and the response granting consent was not testimonial in nature. Beasley claims that by signing the consent to search form for the recording equipment, there was an implication that the items were his and that they were once in his possession and control. Giving consent to search is not evidence which incriminates the person giving consent and is not testimonial. *Cody v. Solem*, 755 F.3d 1323, 1330 (8th Cir. 1985); *see also United States v. Smith*, 3 F.3d 1088, 1098

Appellate Case: 11-2460    Page: 46    Date Filed: 11/10/2011 Entry ID: 3848256

(7th Cir. 1993) ("We have held that a consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation."). However, Beasley relies on *United States v. Hubbell*, 530 U.S. 27 (2000), for the proposition that by signing the consent to search form, he communicated information about the existence, custody, and authenticity of the evidence. *Hubbell* is inapposite. In *Hubbell* the Government subpoenaed records in the care, custody and control of a custodian of records. *Id.* at 31. The Government did not know whether the records existed. *Id.* at 44-45. By the custodian of records producing the documents, the custodian's acts had a testimonial aspect with respect to the existence and location of the documents being sought. *Id.* at 45.

Here, the location, existence and ownership of the cameras and black lockbox were known. Beasley's signing of the consent form was not, therefore, a testimonial act. The act of signing the form did not translate into a testimonial act that Beasley owned or possessed the cameras or the black lockbox.

Beasley's actions were more akin to *Fischer v. United States*, 425 U.S. 391 (1976), than they are to *Hubbell*. In *Fischer*, the court found that the Government seeking production of working papers prepared by the taxpayer's accountant to work on the return was not testimonial in nature because the Government knew of the existence and location of papers and in no way was relying on the truth telling of the

37

taxpayer to prove the existence of his access to the documents. *Hubbell,* 530 U.S. at 44. Here, in no way was Beasley's signing of the consent forms used to show ownership or possessory interest in the cameras or black lockbox.

Finally, Beasley's Sixth Amendment right to counsel did not attach because a defendant only has the right to have counsel present at "critical" stages of the criminal proceedings. *Montejo v. Louisiana*, 129 S.Ct. 2079, 2085 (2009); *United States v. Lewis*, 483 F.3d 871, 873-74 (8th Cir. 2007). A defendant's consent to search is not a critical stage of the proceedings. *United States v. Hidalgo*, 7 F.3d 1566, 1570 (11th Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 40 (2nd Cir. 1990); *Hall v. Iowa*, 705 F.2d 283, 189 (8th Cir. 1983). Thus, law enforcement properly requested Beasley's permission to search the cameras and black lockbox even if the Sixth Amendment right to counsel attached.

> ### 5. District court correctly refused to find that Beasley was in custody from the moment the officers arrived at his store on January 5, 2009, and properly refused suppress any statements he may have made.

> #### a. *Beasley was not in custody from the moment the officers arrived.*

Defendant claims that he was in custody from the moment the officers arrived at his business on January 5, 2009. Defendant was not in custody for purposes of *Miranda* because there was no "'formal arrest or restraint on freedom of movement

Appellate Case: 11-2460    Page: 48    Date Filed: 11/10/2011 Entry ID: 3848256

of the degree associated with a formal arrest.' The 'only relevant inquiry' in considering that question is how a reasonable person in [the suspect's] position would have understood the situation." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (citations omitted); *United States v. Perrin*, No. 10-1885, 2011 WL 5105805, at *1 (8th Cir. Oct. 28, 2011); *see United States v. Muhlenbruch*, 634 F.3d 987, 995-96 (8th Cir. 2011).

There are several factors that a court can consider laid out in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). The *Griffin* factors are simply a "rubric for considering the ultimate issue, not a mandatory checklist." *Perrin*, 2011 WL 5105805, at *1. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 828.

Here, officers, who drove unmarked cars, arrived at Beasley's store around 4:00 p.m. on January 5, 2009, and were not wearing uniforms and did not have their weapons drawn. They introduced themselves. Beasley asked the customers, who were children, to leave. The officers informed Beasley of the purpose of their visit and asked if he had a computer. The officers filled out a consent to search form, and by 4:06 p.m. Beasley signed it. There was no interrogation or formal questioning. The officers, by asking Beasley if he would be willing to go to police headquarters, indirectly informed him that he was not under arrest and the he was free to leave. The

39

officers never forced, coerced or promised anything to Beasley. Their weapons were not drawn. Beasley was never restricted or handcuffed, not even in the ride over to police headquarters. He rode in the front seat of the officer's unmarked car. Beasley was not arrested, but voluntarily went to police headquarters after he signed the consent to search. *M.H.1* at 27, *M.H.2* at 21, Tr. II, 179-80.

Here, there was no indication whatsoever that Beasley's freedom of movement was restrained in such a way as to make a reasonable person in Beasley's position think that he was under arrest. The fact that he was questioned at his business- on his own turf-is a significant factor indicating that he was not in custody. "'When a person is questioned 'on his own turf,'" the surroundings are not indicative of a custodial interrogation. *Id. at 826* (citations omitted); *cf. United States v. Perrin*, 2011 WL 5105805, at *3 (The court found that Perrin, who had a sub-average intellect, attended special education classes and always lived with his mother, was not in custody when he confessed, despite a heavy police presence, because the interview occurred in his own bedroom and he was informed he could leave and did not have to answer questions). Beasley's meeting with the police officers at his store was a consensual meeting that did not implicate the Fourth Amendment. *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1145 (8th Cir. 2007).

Furthermore, Beasley was not in custody even after he was transported to the

Appellate Case: 11-2460     Page: 50     Date Filed: 11/10/2011 Entry ID: 3848256

police headquarters. *United States v. Muhlenbruch*, 634 F.3d 987 (8th Cir. 2011) is instructive. In *Muhlenbruch*, the defendant lived with his wife in an apartment. She discovered images of child pornography on his computer and confronted him about the images. *Id.* at 993. He offered to delete the images but she convinced him not to delete them. She later had another individual enter the apartment and copy the images onto CDs when she and Muhlenbruch were out. *Id.* The individual then went to the police and reported the child pornography. As a search warrant was being prepared to search the apartment, another officer went to the residence to secure it in case Muhlenbruch returned. Before the warrant was obtained, Muhlenbruch returned. The officer at the apartment approached Muhlenbruch and briefly spoke with him without explaining why the officer was there. The officer told Muhlenbruch that he was not under arrest and then transported Muhlenbruch to the police station in the back of his patrol car for questioning. *Id.* at 993-94.

At the police station, Muhlenbruch was told he was not under arrest and was free to leave. He was then interviewed about the images found on the computer without being informed of his *Miranda* rights. He eventually asked for a lawyer. *Id.* at 994. After he asked for a lawyer, he told the officers he would consent to the search of his computer, even though he initially refused to consent to the search. *Id.* at 994-95, 997. Muhlenbruch traveled with the officers back to his apartment and

41

assisted them in seizing his computer. Muhlenbruch was not arrested and remained at his apartment when the officers left. *Id.* at 995.

The court found that Muhlenbruch was not in custody based on the totality of circumstances and that the police officers were not required to inform him of his *Miranda* rights. *Id.* at 997.

Applying the findings in *Muhlenbruch* to the case at hand, Beasley was not in custody at the police station. Beasley, like Muhlenbruch, rode to the police station in a police car; Beasley rode un-handcuffed in the front seat of an unmarked car, whereas Muhlenbruch rode in the back seat of a patrol car, possibly handcuffed. Neither Beasley nor Muhlenbruch were handcuffed at the police station. Beasley, like Muhlenbruch, was not under arrest and free to leave, although Muhlenbruch was explicitly told so. Beasley was implicitly informed that he was not under arrest and was free to leave when the officers asked if he would be willing to go to police headquarters. Beasley could have refused, but instead he voluntarily accompanied the officers to police headquarters.

The officers here, like the officers in Muhlenbruch, did not threaten Beasley or raise their voices. Finally, although Beasley was arrested at the conclusion of the interview, he was not questioned about the allegations of sexual abuse or arrested until after receiving his *Miranda* warnings.

42

Thus, considering the totality of the circumstances, Beasley was not in custody even at the police station.

Likewise, Beasley's statements were voluntarily made. The court in *Muhlenbruch* looked at the totality of the circumstances to determine that Muhlenbruch's statements were voluntary. It considered that Muhlenbruch was not in custody at the time he made the statements and confessed at the police station after twenty-two minutes. *Id.* at 998. It found that Muhlenbruch was a relatively intelligent person in his late thirties and had been arrested on at least two prior occasions. The court also noted that the officers did not raise their voices, promise anything or make physical threats.

Beasley, like Muhlenbruch, was not in custody. However, unlike Muhlenbruch, Beasley was not questioned about the sexual abuse allegation until after he was informed of his *Miranda* rights. Beasley, like Muhlenbruch, is an intelligent man who was close to forty years old at the time of the questioning. Beasley's intelligence is evidenced by the fact that he was business man, a salesman and had an engineering degree. *See* Tr. II, 227; Tr. III, 593; Tr. IV, 706 (Sentencing Transcript).

Beasley, like Muhlenbruch, was previously arrested and was familiar with the criminal justice center. Beasley was arrested in Jefferson County, Missouri, for

43

allegedly having oral sex with his girlfriend's son, but was never charged with a crime. *M.H.1* at 20. He was also arrested in the City of St. Louis for a similar allegation, was charged with a crime, tried, and acquitted. *Id.* Thus, taking into account Beasley's intelligence and experience with the criminal justice center, Beasley would not be so overcome by police authority as to make his statement involuntary.

Finally here, just like in *Muhlenbruch*, the police did not raise their voices, threaten Beasley, or promise him anything. Thus, considering the totality of circumstances, Beasley's statements were voluntarily made.

Finally, it can be inferred from Beasley's trial testimony that he did not think he was in custody. Beasley testified that he asked for help at the police station because the police told him that they were going to arrest him. Assuming this is true for arguments sake, Beasley did not ask for help until the end of his *Mirandized* interview. Tr. II, 189, 207-8; Tr. III, 582. Thus, Beasley did not think he was under arrest until the end of the *Mirandized* interview at police headquarters.

In summary, because Beasley was not in custody at his store, the police officers were not required to inform him of his *Miranda* warnings.

> b. *The district court properly found that Beasley's Miranda warnings given at the police station were sufficient.*

Appellate Case: 11-2460    Page: 54    Date Filed: 11/10/2011 Entry ID: 3848256

The district court properly found that defendant's statements made before and after being advised of his *Miranda* rights on January 5, 2009, were not subject to suppression. Defendant's post-*Miranda* statements are admissible unless coerced. In *Oregon v. Elstad*, 470 U.S. 298, 318 (1985), the Court held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."

Here, Beasley was not subject to coercive questioning either prior to or after being given his *Miranda* warnings. On January 5, 2009, as stated above, Beasley was not questioned about the allegations at his store. The police asked Beasley if he would accompany them to police headquarters so that they could talk to him, thus inferring he was not under arrest and was free to leave. Beasley voluntarily agreed to go with the police. Beasley drove in the front seat of Cavelleti's vehicle and was not restrained. They arrived at police headquarters around 5:00 p.m. Once there, they asked the Beasley to sign another consent to search form for the computer they seized. He signed the consent to search form at 5:05 p.m. He was then taken to an interview room. Guinn and Cavaletti went to the interview room and advised Beasley of his *Miranda* rights. He waived his rights and by 5:30 p.m. he signed the *Miranda* rights form. After the defendant signed the *Miranda* rights form, he was then

45

questioned about the allegations that were made against him.  He was not questioned about the allegations until that time.  Beasley talked with the officers until approximately 7:45 p.m.  *M.H.1* at 20; Tr. II, 189.

The police officers never yelled at Beasley nor attempted to coerce him in any way.  He was not threatened nor promised anything in order to induce him to make a statement.  *M.H.1* at 11-12, 19-20.

Likewise, the police officers here did not partake in the same antics as the police did in *Missouri v. Seibert*, 542 U.S. 600 (2004).  There, the police purposely conducted a custodial interrogation until it produced a confession and then administered *Miranda* warnings immediately after the confession. *Id.* at 616. The tactic undermined the *Miranda* warnings.  *Id.*  The Supreme Court found that both confessions should be suppressed.

Here, the police did not conduct an interrogation concerning the allegations until after defendant was advised of his *Miranda* warnings.  The police never engaged in any type of tactic designed to thwart the *Miranda* warnings nor to overbear Beasley's will as the police did in *Seibert*.  Therefore, the district court properly found the *Miranda* warnings sufficient and properly refused to suppress defendant's statements made on January 5, 2009.

Appellate Case: 11-2460     Page: 56     Date Filed: 11/10/2011 Entry ID: 3848256

## II. THE MAGISTRATE JUDGE PROPERLY DENIED BEASLEY'S MOTION FOR A BILL OF PARTICULARS.

### A. <u>Standard of Review</u>

This Court reviews a denial of a motion for a bill of particulars for an abuse of discretion. *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011).

### B. <u>Argument</u>

The magistrate judge correctly denied defendant's motion for a bill of particulars. "A bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment is too vague and indefinite." *United States v. Hernandez*, 299 F.3d 984, 989-90 (8th Cir. 2002) (citation omitted); *see also Huggans,* 650 F.3d at 1220; *United States v. Stephenson*, 924 F.2d 753, 762 (8th Cir.1991). A conviction will not be overturned for failure to order a bill of particulars unless the defendant suffers actual prejudice due to surprise at trial. *See United States v. Garrett*, 797 F.2d 656, 665 (8th Cir. 1986). The magistrate judge found that the indictment was "sufficiently precise that it informs the Defendant of the charge against him in enough detail to enable him to prepare a defense, to avoid the danger of surprise at trial, and to plead his acquittal

47

or conviction as a bar to further prosecution on this same offense." Appellant Addendum, at 27 (Order, March 11, 2011, at 1). The court's finding obviated the need for a bill of particulars because the indictment contains "a plain, concise, and definite statement of the essential facts constituting the offense charged" and, therefore, complies with Fed. R. Crim. P. 7(c)(1). Each count of the indictment in this case sets forth a legally adequate description of the charged offenses.

The indictment and discovery together provided Beasley enough information to understand the charges against him and prepare a defense. *See Huggans*, 650 F.3d at 1220. Under such circumstances, a bill of particulars was not required. *See United States v. Maull*, 806 F.2d 1340, 1345-46 (8th Cir. 1986). A bill of particulars is not required when the government, as it did here, made sufficient disclosures concerning it evidence and witnesses by other means. *United States v. Chen*, 378 F.3d 151, 163 (2nd Cir. 2004).

The unique circumstances of this case make it difficult for Beasley to demonstrate actual prejudice due to surprise at trial. Beasley's crimes in ten of the counts were the video recordings of his sexual abuse of several young children. Each crime was "caught on tape." The government relied on these recordings to prove Beasley's guilt at trial. There were no questions as to what crimes the government was prosecuting.

48

Beasley claims that the dates in the indictment are too broad. "Generally, exact dates are not required so long as they are within the statute of limitation . . . and no prejudice is shown." *See United States v. Nunez*, 668 F.2d 10, 12 (1st Cir. 1981) (citation and internal quotation marks omitted). A large time window is required in counts involving child sexual abuse because of the difficulty of children remembering exact dates and times. Also, with this particular case, because the children were asleep in the videos pertaining to Counts one through eight, it is very difficult for the victims to determine the dates of the abuse. As to M.T., the sexual abuse perpetrated against him happened over several years and it would be difficult to pinpoint when the recordings were made.

Here, the government showed the video recordings to Beasley well in advance to the trial. Thus, Beasley viewed the evidence that depicted the actual physical abuse that occurred. He knew the details of each crime. Accordingly, the indictment and discovery provide the defendant with sufficient information to understand the charges against him, to adequately prepare a defense, and to protect himself against double jeopardy.

Beasley was fully aware that the charges in Counts One through Eight were based upon videos of child pornography of eight different victims that were produced at his "Gamestation" stores because he and his counsel viewed the videos prior to and

49

during trial. Beasley was also fully aware that the charge in Count Nine was based upon the production of child pornography in which M.T. was a victim because he and his counsel viewed the videos and images. The images of M.T. depicted M.T. at various ages. Likewise, Beasley was fully aware that the charge in Count Ten was based upon the production of child pornography in which M.H. was a victim because he and counsel viewed the videos.

Thus, Beasley was fully apprised of the charges against him and is not subject to double jeopardy. *See Huggans*, 650 F.3d at 1220. The district court correctly denied Beasley's motion for a bill of particulars.

## III. THE DISTRICT COURT PROPERLY APPLIED THE SENTENCING ENHANCEMENTS.

### A. <u>Standard of Review</u>

In reviewing a district court's decision to impose certain sentencing enhancements, the district court's factual findings are reviewed for clear error and its construction and application of the Guidelines are reviewed de novo. *United States v. Raplinger*, 555 F.3d 687, 693 (8th Cir. 2009).

### 1. The district court properly applied U.S.S.G. § 2G2.1(b)(1)(A) because B.E.N. was under the age of twelve when Beasley produced the child pornography of him.

Beasley contends that the district court erroneously enhanced the Guideline

50

calculation by four levels pursuant to U.S.S.G. § 2G2.1(b)(1)(A) for a victim under the age of twelve because there was no direct evidence that victim B.E.N. was under twelve years of age.

In determining the Sentencing Guideline range, the district court should use a preponderance of the evidence standard. *United States v. Gaines*, 639 F.3d 423, 427 (8th Cir. 2011) ("The government bears the burden of proving by a preponderance of the evidence that the . . . enhancement is warranted."). The testimony and evidence adduced at the trial supports the application of § 2G2.1(b)(1)(A). B.E.N. testified that his birth date was June 18, 1996. Tr. III, 533. According to the time stamps for the videos produced of B.E.N, one of the videos was produced on November 23, 2007, and the other was produced on June 16, 2008. *Id.* at 363. Thus, according to the time stamps, B.E.N. was eleven years old at the time the videos were produced.

There was sufficient evidence presented at trial to show by a preponderance of the evidence that the time stamps were accurate. Detective Wilds of the St. Louis County Police Department forensically examined the defendant's video camera. He found that each time the video camera was used to make a recording, a file name was created by the camera that included a number. *Id.* at 360. For every subsequent video taken with the camera, a sequential video file name was created. Based on the camera's clock, each file also contained information about the date and time the file

51

was created. Wilds testified that when he examined the camera, he compared the camera's clock with the time in his laboratory. He said that at the time he checked the clock on the camera, the date was accurate but that the clock was eleven hours fast. Tr. II, 281-82; Tr. III, 360.

Wilds also testified that he examined the content of the videos. He compared the contents of the videos with the time stamps for the videos and noted that the times and dates, when taking into account that the camera clock was eleven hours fast, appeared to correspond the time of day and the season of the year indicated in the video. Tr. II, 283. The time stamps also corresponded with the sequence of the videos as indicated by the file names of the videos. Tr. III, 426.

Furthermore, other testimony supported the finding that the time stamp was correct. The creation dates for M.H.'s videos were contained on the same video camera as the videos produced of B.E.N. The file stamps for the M.H. videos showed that the videos were created in January 2007. *See, e.g.,* Tr. II, 338. M.H.'s father testified that M.H. was with the defendant on a trip out of state in January 2007. Tr. III, 483-84; *contra id.* at 493 (M.H. thought the trip was in 2008). It was during this trip that Beasley recorded M.H. *Id.* at 499-504; *contra id.* at 601 (the defendant testified that the trip occurred in March 2007); *id.* at 603 (the defendant testified that the bathroom videos of M.H. occurred in St. Louis). Thus, the time stamps were also

52

found to be accurate for the videos recorded in January 2007.

Thus, based upon the above, the video camera correctly recorded the date and time that the video was produced, taking into account that the clock was eleven hours fast. Therefore, based upon the time stamp generated by the camera for the videos of B.E.N., B.E.N. was less than twelve years of age when the videos were produced.

### 2. The district court properly applied U.S.S.G. § 2G2.1(b)(5) because the victims were in the custody, care, or supervisory control of defendant.

The district court properly applied U.S.S.G. § 2G2.1(b)(5), an enhancement that adds two levels if a victim was in the custody, care, or supervisory control of the defendant. The evidence presented at trial supported the application of § 2G2.1(b)(5) because it showed that the videos defendant produced of B.E.N., K.A., R.B., T.R., R.I., and T.E., were produced at lock-ins at a "Gamestation" store. The defendant is the one who hosted the lock-ins. *T.T.* at 572. As the owner of the store, Beasley was the one who decided to host the lock-ins. According Beasley, the children could not attend the lock-ins unless their parents signed a release form. *Id.* at 573. The release form contained information such as the child's, address, phone number, emergency contact information, and what games that child was allowed to play. *Id.* Also, the parents had to pay a fee for their children to attend. *Id.* According to the defendant, he would take some of the children to their homes after the lock-ins. *Id.* at 615.

53

Furthermore, B.E.N., K.A., T.R., R.I., and T.E. all testified that the defendant was always present during the lock-ins. *Id.* at 516, 527, 537, 542 and 552. And once the defendant was arrested, the lock-ins stopped. *Id.* at 455. Thus, the evidence adduced at trial shows that during the lock-ins, the children were entrusted to Beasley who had custody, care, and supervisory control of the children.

## IV. THE DISTRICT COURT DID NOT IMPOSE A SUBSTANTIALLY UNREASONABLE SENTENCE AND CORRECTLY CONSIDERED SECTION 3553(a) FACTORS.

### A. Standard of Review

The sentence imposed by the district court is reviewed "under the abuse-of-discretion standard, 'taking into account the totality of circumstances.' The within-guidelines sentence is presumptively reasonable on appeal." *United States v. Borromeo*, No. 10-3229, 2011 WL 4503197, at *1 (8th Cir. Sep. 30, 2011) (citation omitted). "A district court abuses its discretion when it (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *Id., citing United States v. Feemster*, 572 F.3d 455, 461 (8th Cir.2009) (en banc).

### B. Argument

Beasley acknowledges that the district court considered the necessary factors

Appellate Case: 11-2460      Page: 64      Date Filed: 11/10/2011 Entry ID: 3848256

in determining his sentence, but he claims the district court improperly weighed them by giving too little weight to mitigating factors, such as defendant's age and lack of criminal history.

The district court took into account defendant's criminal history, education, employment, and age. Tr. IV, 710 (Sentencing Transcript July 5, 2011). The district court also took into account the seriousness of the crime, and that he took advantage of the "vulnerability of a lot of children." The district court found that Beasley pursued the children "insidiously and relentlessly." *Id.* at 710-11. The district court also took into account that Beasley attempted to enlist his mother in destroying the evidence. Finally, the district court noted that when he testified, he lied. The district court found that Beasley lied about his face being in the video even though it was apparent that it was he. The court found that Beasley showed absolutely no remorse for the actions he has committed or the harm he caused to the children. The court found that a sentence within the guideline range was appropriate and sentenced the defendant to a total of 3,480 months. *See United States v. Boneshirt*, No. 10-3108, 2011 WL 5119469, at *8 (8th Cir. Oct. 31, 2011) (A "harsh" sentence that falls within a properly-calculated advisory Guidelines range may be considered presumptively reasonable.).

Thus, the district court carefully considered each of the factors.

Appellate Case: 11-2460     Page: 65     Date Filed: 11/10/2011 Entry ID: 3848256

## V. THE DISTRICT COURT DID NOT ERR BY ALLOWING A WITNESS TO TESTIFY AS TO THE AGES OF THE CUSTOMERS OF THE STORE WHICH BEASLEY OWNED.

### A. Standard of Review

This Court reviews a district courts evidentiary rulings for an abuse of discretion. *United States v. Van Elsen*, 652 F.3d 955, 958 (8th Cir. 2011). The court gives substantial deference to the district court's ruling. *Id.* Even if the district court's ruling was improper, the court will reverse only when the ruling affected a substantial right or had more than a slight influence on the verdict. *Id.*

### B. Argument

Douglas was a customer and later became an employee for Beasley at the "Gamestation" store. Federal Rule of Evidence 602 permits a lay witness to offer an opinion so long as the testimony is based on the perception of the witness and is helpful to the jury. Here, Beasley claims that Douglas did not have personal knowledge to testify about the ages of the customers who attended Beasley's "Gamestation" store. Beasley argues that the trial judge improperly allowed the following:

Prosecutor:  Thank you. Now, how did you meet Mr. Beasley?

Douglas:     I attended his Gamestation as a customer in the summer of 2008.

          . . . .

56

| | |
|---|---|
| Prosecutor: | By the age group of the people that went there, about how old were they? |
| Defense: | Objection. He can't testify to the ages of other customers, unless he had personal knowledge of everyone's age who was there. |
| Court: | Well, I am going to overrule it. |
| Douglas: | It ranged from, I would say, seven to anywhere from -- I don't know. There were some adults there too. But I guess the average would have been 7 to 18ish. |

Tr. III, 442.

In *United States v. White Calf*, 634 F.3d 453, 460 (8th Cir. 2011), the court found that an officer's lay-opinion testimony about the age of a victim was proper. Here, the testimony was not pertaining to a victim, but to age of the clientele that frequented Beasley's store. In fact, Beasley himself testified as to the age of the clientele. Tr. III, 574. Thus, Douglas' testimony was proper because it was based upon his observations. Even if it were not, Beasley testified that children, teenagers, and adults frequented his establishment.

## VI. THE DISTRICT COURT CORRECTLY GAVE THE EIGHTH CIRCUIT MODEL REASONABLE DOUBT INSTRUCTION.

### A. Standard of Review

The court reviews a district court's determination of whether to submit a particular instruction under the abuse of discretion standard. *United States v. Gibson*,

57

Appellate Case: 11-2460     Page: 67     Date Filed: 11/10/2011 Entry ID: 3848256

105 F.3d 1229, 1233 (8th Cir. 1997).

**B.** **<u>Argument</u>**

Defendant claims that the district court abused its discretion by rejecting his proffered instructions and instead, giving Eighth Circuit Model Jury Instruction 3.11, Reasonable Doubt, which includes the "mere possibility of innocence" language. This Court has repeatedly affirmed the propriety of this instruction. *See, e.g., United States v McCraney*, 612 F.3d 1057, 1063 (8th Cir. 2010) ("We have upheld the constitutionality of Model Instruction 3.11, *see United States v. Foster*, 344 F.3d at 802 (8th Cir.2003); *United States v. Rosso*, 179 F.3d 1102, 1104 (8th Cir.1999), and neither the 'hesitate to act' phrase . . ., nor the 'not the mere possibility of innocence' language . . . is objectionable."); *Foster*, 344 F.3d at 802. As the constitutionality of this instruction has repeatedly been upheld, the district court did not abuse its discretion in giving it to the jury.

58

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests this Court to affirm the district court's judgment and sentence.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney


/s/ Robert F. Livergood
ROBERT F. LIVERGOOD
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

59

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(b), the undersigned hereby certifies that this brief complies with the type-volume limitation.  The number of words contained in the pertinent portions of this brief is 13,796 according to the word counting device of WordPerfect X4.

Respectfully submitted,


/s/ Robert F. Livergood
ASSISTANT UNITED STATES ATTORNEY

Appellate Case: 11-2460    Page: 70    Date Filed: 11/10/2011 Entry ID: 3848256

# <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this document has been scanned for viruses and is virus free. An electronic version of this document was filed with the Clerk of the Court for the Eighth Circuit and Nanci McCarthy via its electronic filing system on this 9th day of November, 2011.


/s/ Robert F. Livergood
ASSISTANT UNITED STATES ATTORNEY